**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JUNE 9, 2004**

MAYOR OF THE CITY OF LANSING,
CITY OF LANSING, and INGHAM
COUNTY COMMISSIONER LISA DEDDEN,

    Appellees/Cross-Appellants,

v                                               No. 124136

MICHIGAN PUBLIC SERVICE
COMMISSION and WOLVERINE PIPE
LINE COMPANY,

    Appellants/Cross-Appellees.

_____

BEFORE THE ENTIRE BENCH

TAYLOR, J.

In this case, we are called on to determine if defendant Wolverine Pipe Line Company (Wolverine) must obtain the permission of the city of Lansing before constructing a gas pipeline longitudinally in the right-of-way adjacent to an interstate highway when part of the pipeline would be constructed within city limits. We affirm the Court of Appeals decision that Wolverine must obtain local consent but that such consent need not be

obtained before the application is submitted to the Michigan Public Service Commission (PSC).

                                I

Wolverine is an interstate common carrier that constructs, operates, and maintains pipelines used for transporting petroleum products. It planned to construct a twenty-six-mile liquid petroleum pipeline along the Interstate-96 (I-96) corridor, within the right-of-way of the interstate highway. Although the land is under the control and jurisdiction of the state's Department of Transportation, several miles of the highway are within the city limits.

In December 2001, Wolverine, before commencing any work on the project, filed an application with the PSC for approval of its plan. The mayor and the city, as well as Ingham County Commissioner Lisa Dedden, were allowed to intervene in the PSC proceeding.[1] The application was treated as a contested case and a hearing was held. The city moved to dismiss the application, arguing that the PSC had no jurisdiction because Wolverine's application lacked the requisite consent from the city. The PSC denied the

_____

[1] Because of the similarity of interests, these three parties will be referred to as "the city."

2

motion and authorized the project, finding that the city's consent was not required to accompany the application. With regard to the reasonableness of the project, the PSC determined that there were no equal protection violations in the route selection and found the project necessary and safe.

The city appealed to the Court of Appeals. The Court reviewed the plain language of MCL 247.183 and determined that the statute did require local consent before construction began, but not before the applicant sought PSC approval. 257 Mich App 1, 16; 666 NW2d 298 (2003). Both sides sought leave to appeal. Wolverine and the PSC asserted that no local approval is required, and the city argued that approval is required during the application stage. This Court granted leave to appeal on both applications. 469 Mich 898 (2003).

II

We review de novo a question of statutory construction. In construing a statute, we are required to give effect to the Legislature's intent. That intent is clear if the statutory language is unambiguous, and the statute must then be enforced as written. *Weakland v Toledo Engineering Co*, 467 Mich 344, 347; 656 NW2d 175 (2003). We use the same rules of construction both for

3

statutes and for administrative regulations. *Soap &
Detergent Ass'n v Natural Resources Comm*, 415 Mich 728,
756-757; 330 NW2d 346 (1982).

## III

The statute that controls this case is MCL 247.183,
which reads:

> (1) Telegraph, telephone, power, and other
> public utility companies, cable television
> companies, and municipalities may enter upon,
> construct, and maintain telegraph, telephone, or
> power lines, pipe lines, wires, cables, poles,
> conduits, sewers or similar structures upon,
> over, across, or under any public road, bridge,
> street, or public place, including, subject to
> subsection (2), longitudinally within limited
> access highway rights of way, and across or under
> any of the waters in this state, with all
> necessary erections and fixtures for that
> purpose. A telegraph, telephone, power, and other
> public utility company, cable television company,
> and municipality, before any of this work is
> commenced, shall first obtain the consent of the
> governing body of the city, village, or township
> through or along which these lines and poles are
> to be constructed and maintained.

> (2) A utility as defined in 23 C.F.R.
> 645.105(m) may enter upon, construct, and
> maintain utility lines and structures
> longitudinally within limited access highway
> rights of way in accordance with standards
> approved by the state transportation commission
> that conform to governing federal laws and
> regulations. The standards shall require that the
> lines and structures be underground and be placed
> in a manner that will not increase highway
> maintenance costs for the state transportation
> department. The standards may provide for the
> imposition of a reasonable charge for
> longitudinal use of limited access highway rights
> of way. The imposition of a reasonable charge is

4

a governmental function, offsetting a portion of the capital and maintenance expense of the limited access highway, and is not a proprietary function. The charge shall be calculated to reflect a 1-time installation permit fee that shall not exceed $1,000.00 per mile of longitudinal use of limited access highway rights of way with a minimum fee of $5,000.00 per permit. All revenue received under this subsection shall be used for capital and maintenance expenses incurred for limited access highways.

Wolverine does not here dispute that it is both a "public utility," as that phrase is used in subsection 1 of the statute, as well as a subsection 2 "utility as defined in 23 C.F.R 645.105[.]"[2] Definitionally, both subsections are applicable to Wolverine unless something in the statute excludes Wolverine from the reach of one subsection or the other. Wolverine argues that such exclusionary language is found in subsection 1, which, paraphrased, states that any covered utility, including those subject to subsection 2,

_____

[2] This includes

a privately, publicly, or cooperatively owned line, facility or system for producing, transmitting, or distributing communications, cable television, power, electricity, light, heat, gas, oil, crude products, water, steam, waste, storm water not connected with highway drainage, or any other similar commodity, including any fire or police signal system, which directly or indirectly serves the public. The term utility shall also mean the utility company inclusive of any wholly owned or controlled subsidiary. [23 CFR 645.105.]

5

may use a public road longitudinally within the limited access highway right-of-way if it has local permission before work commences. The company's construction of this passage is that the quoted phrase serves to remove subsection 2 utilities from subsection 1 rules and thus such utilities must only comply with the requirements of subsection 2. In support of this, Wolverine primarily contends that this reading is the only proper construction because otherwise the language "subject to subsection (2)" would be left without meaning. Because such constructions are to be avoided, and because Wolverine believes its reading gives the phrase meaning, it urges us to adopt that reading.[3] We decline to do so, as did the Court of Appeals before us, because we think the reading urged by the city also gives meaning to and more accurately reflects the statute.

---

[3] Wolverine also suggests several ways in which the statute could have been worded to clearly indicate an intent to impose both subsections on longitudinal projects. Wolverine posits that because the statute is not worded in one of the ways it suggests, it follows that the Legislature intended to impose only the requirements of subsection 2 on longitudinal projects. This argument is unconvincing because, while the Legislature doubtlessly could have made its intentions clearer in this statute, the fact that it has not done so by adopting any of Wolverine's suggested approaches does not relieve this Court of giving meaning to what *actually* was written.

We note that *Random House Webster's College Dictionary* (2001 ed), defines "subject" when used as an adjective in six ways. The most applicable is the fourth definition, "dependent upon something (usu. fol. by *to*): *His consent is subject to your approval."* This definition, in essence, gives to the word "subject" the meaning, "dependent upon." When used as it is here and in other places in the Legislature's work, it is clear that the subsections work together,[4] see, e.g., MCL 15.443, 18.1237, and 168.677. That is, both subsections are applicable because the relevant words in subsection 1, the "subject to" words, do not mean that the requirements of subsection 1 do not apply to those utilities that are covered also by subsection 2. Further, because the Legislature expressly (and uniquely) used the word "including" before the "subject to" phrase, the implication is even stronger that the two subsections

---

[4] Moreover, even if one were inclined to utilize one of the other five definitions in the dictionary ("under the domination, control, or influence of something [often fol. by *to*]"; "being under the dominion, rule, or authority of a sovereign, state, etc. [often fol. by *to*]"; "open or exposed [usu. fol. by *to*]: *subject to ridicule*"; "being under the necessity of undergoing something [usu. fol. by *to*]: *All beings are subject to death*"; or "liable, prone [usu. fol. by *to*]: *subject to headaches*"), these also lead to the same conclusion that "dependent upon" yields: that interaction, rather than disconnection, of the subsections is called for.

are to be read in combination. Thus, subsection 1 means the project cannot go forward without local approval and, not at all incompatibly, subsection 2 means it cannot go forward unless it meets certain construction standards.

We are aware, and, indeed, Wolverine forcefully argues, that this reading of the statute may facilitate frivolous and potentially crippling resistance from local governments along the route of a utility project. Such an argument, however, misunderstands the role of the courts. Our task, under the Constitution, is the important, but yet limited, duty to read into and interpret what the Legislature has actually made the law. We have observed many times in the past that our Legislature is free to make policy choices that, especially in controversial matters, some observers will inevitably think unwise. This dispute over the wisdom of a law, however, cannot give warrant to a court to overrule the people's Legislature. See *Oakland Co Rd Comm'rs v Michigan Property & Cas Guaranty Ass'n*, 456 Mich 590, 612-613; 575 NW2d 751 (1998). We therefore affirm the Court of Appeals decision that subsection 1 as well as subsection 2 control and Wolverine is required by MCL 247.183 to get local consent before constructing its pipeline longitudinally in the right-of-way of I-96.

8

Because we find that Wolverine is required to obtain local consent for its project, we must also address the question of when that consent must be obtained. The Court of Appeals found that local consent only has to be secured before work is commenced. Thus, at the time the permit from the PSC was sought, proof of local consent did not need to accompany the application. We agree with this holding.

We begin our analysis with the statute that unambiguously requires local consent "before any of this work is commenced . . . ." MCL 247.183. We note also that the PSC's applicable rule, 1999 AC, R 460.17601(2)(d), indicates that applications for new construction of utility facilities "shall set forth, or by attached exhibits show, . . . [t]he municipality from which the appropriate franchise or consent has been obtained, if required, together with a true copy of the franchise or consent."[5]

_____

[5] 1999 AC, R 460.17601 reads in its entirety:

(1) An entity listed in this subrule shall file an application with the commission for the necessary authority to do the following:

(a) A gas or electric utility within the meaning of the provisions of Act No. 69 of the Public Acts of 1929, as amended, being §460.501

(continued…)

9

et seq. of the Michigan Compiled Laws, that wants to construct a plant, equipment, property, or facility for furnishing public utility service for which a certificate of public convenience and necessity is required by statute.

(b) A natural gas pipeline company within the meaning of the provisions of Act No. 9 of the Public Acts of 1929, as amended, being §483.101 et seq. of the Michigan Compiled Laws, that wants to construct a plant, equipment, property, or facility for furnishing public utility service for which a certificate of public convenience and necessity is required by statute.

(c) A corporation, association, or person conducting oil pipeline operations within the meaning of the provisions of Act No. 16 of the Public Acts of 1929, being §483.1 et seq. of the Michigan Compiled Laws, that wants to construct facilities to transport crude oil or petroleum or any crude oil or petroleum products as a common carrier for which approval is required by statute.

(2) The application required in subrule (1) of this rule shall set forth, or by attached exhibits show, all of the following information:

(a) The name and address of the applicant.

(b) The city, village, or township affected.

(c) The nature of the utility service to be furnished.

(d) The municipality from which the appropriate franchise or consent has been obtained, if required, together with a true copy of the franchise or consent.

(e) A full description of the proposed new construction or extension, including the manner in which it will be constructed.

(continued…)

The PSC rule only requires utilities to provide proof of local consent if such is required to be obtained *at the time the application is made*, and the statute here does not require it. Thus, we agree with the PSC and the Court of Appeals that proof of local consent need not be filed with the application for this project. Although local consent was not filed with the application, the statute and the rules have been complied with and the PSC proceeded well within its authority.

V

Concerning the dissent, we offer the following observations:

(1) The justices in this majority do not necessarily disagree with the dissent that MCL 247.183, as we construe it here, may be "cumbersome." *Post* at 17. Nor, by this opinion, does any justice in this majority suggest that, had they been in the Legislature, they would have cast a

---

(…continued)

(f) The names of all utilities rendering the same type of service with which the proposed new construction or extension is likely to compete.

(3) A utility that is classified as a respondent pursuant to the provisions of R 460.17101 may participate as a party to the application proceeding without filing a petition to intervene. It may file an answer or other response to the application.

11

vote in support of MCL 247.183 as it is interpreted here. Nor are the justices in this majority oblivious to the practical difficulties that our interpretation of the law may impose upon utilities such as Wolverine Pipe Line Company. Rather, what we decide today is merely that the language of MCL 247.183 compels a particular result, and the justices of this majority do not believe themselves empowered to reach a different result by substituting their own policy preferences for those of the Legislature.

(2) Rather than interpreting the language of MCL 247.183, the dissent prefers to divine what it characterizes as the Legislature's "true intent." *Post* at 1. This "true intent" is not one to be gleaned from the words actually enacted into law by the Legislature, but through reliance on various random facts and circumstances that the dissent selectively picks out from the universe of potentially available facts and circumstances. In contrast, rather than engaging in legislative mind-reading to discern the "true intent" of the law, we believe that the best measure of the Legislature's intent is simply the words that it has chosen to enact into law. Among other salutary consequences, this approach to reading the law allows a court to assess not merely the intentions of one

12

or two highlighted members of the Legislature, but the intentions of the *entire* Legislature.

(3) The dissent avoids the difficult task of having to read the actual language of the law and determine its best interpretation by peremptorily concluding that MCL 247.183 is "ambiguous." *Post* at 2. A finding of ambiguity, of course, enables an appellate judge to bypass traditional approaches to interpretation and either substitute presumptive "rule[s] of policy," see *Klapp v United Insurance*, 468 Mich 459, 474; 663 NW2d 447 (2003), quoting 5 Corbin, Contracts (rev ed, 1998), § 24.27, p 306, or else to engage in a largely subjective and perambulatory reading of "legislative history." However, as *Klapp*, relying on the treatises of both Corbin and Williston, concluded, a finding of ambiguity is to be reached only after "all other conventional means of [ ] interpretation" have been applied and found wanting.[6] *Klapp, supra* at 474. Where the majority applies these conventional rules and concludes that the language of MCL 247.183 can be reasonably understood, the dissent, without demonstrating the flaws of

_____

[6] While *Klapp* concerned contract interpretation and the instant case statutory interpretation, the rule stated in *Klapp, supra* at 474—that ambiguity is a finding of last resort—applies with equal force whether the court is interpreting a statutory text or a contractual one.

13

the majority's analysis except to assert that its opinion is not in accord with the "true intent" of the Legislature, opines that an "ambiguity" exists. An analysis, such as that of the dissent, that is in conflict with the actual language of the law and predicated on some supposed "true intent" is necessarily a result-oriented analysis. In other words, it is not a legal analysis at all.

(4) In peremptorily reaching its conclusion that MCL 247.183 is "ambiguous," the dissent entirely misstates the standard for discerning ambiguity. The dissent would hasten findings of "ambiguity" by courts by predicating these findings on the basis of whether "reasonable minds can differ regarding" the meaning of a statute. *Post* at 3. Especially in the context of the types of cases and controversies considered by this Court—those in which the parties have been the most determined and persistent, the most persuaded by the merits of their own respective arguments—it is extraordinarily difficult to conclude that reasonable minds cannot differ on the correct outcome. That is not, and has never been, the standard either for resolving cases or for ascertaining the existence of an ambiguity in the law. The law is not ambiguous whenever a dissenting (and presumably reasonable) justice would interpret such law in a manner contrary to a majority.

14

Where a majority finds the law to mean one thing and a dissenter finds it to mean another, neither may have concluded that the law is "ambiguous," and their disagreement by itself does not transform that which is unambiguous into that which is ambiguous. Rather, a provision of the law is ambiguous only if it "irreconcilably conflict[s]" with another provision, *id*. at 467, or when it is *equally* susceptible to more than a single meaning. In lieu of the traditional approach to discerning "ambiguity"—one in which only a few provisions are truly ambiguous and in which a diligent application of the rules of interpretation will normally yield a "better," albeit perhaps imperfect, interpretation of the law—the dissent would create a judicial regime in which courts would be quick to declare ambiguity and quick therefore to resolve cases and controversies on the basis of something other than the words of the law.[7] Moreover, the dissent implies that the decision of the United States Supreme Court in *Yellow Transportation, Inc, v Michigan*, 537 US 36;

---

[7] The dissent also confusingly conflates unambiguousness and clarity. *Post* at 5. Instead, a great many unambiguous provisions of the law are far from clear. The interpretative process is often quite difficult, struggling to remove a great deal of textual underbrush. A provision of law that is unambiguous may well be one that merely has a better meaning, as opposed to a clear meaning.

15

123 S Ct 371; 154 L Ed 2d 377 (2002), should be read to compel the adoption of his view of how we determine if a statute is ambiguous. We believe this is a misreading of *Yellow Transportation.* The United States Supreme Court established no rule in *Yellow Transportation* for determining or resolving statutory ambiguity. Moreover, even if the Court had fixed upon a method it chooses to use to determine if a statute is ambiguous, it could not be understood to have superceded the rules that state courts may use in a like undertaking. The United States courts, of whatever sort, when they rule, are of course always respectfully reviewed by state court judges but such holdings are only binding in a narrow range of cases such as, classically, in the construction and meaning of the United States Constitution. Statutory construction techniques are not of this genre. With that distraction clarified, *Yellow Transportation* should be understood as a narrow holding that stands for the simple proposition that if a federal administrative agency has given a defensible construction to a federal statute that it applied, that all state courts must follow that construction even if alternative constructions are also reasonable. We deal with no such situation in this case, and thus *Yellow*

16

*Transportation* is inapposite in all particulars to this matter.

(5) The dissent wrongly asserts that "the majority fails to construe subsection 1 in light of subsection 2 . . . ." *Post* at 6-7. Rather, we assert that "subsection 1 means the project cannot go forward without local approval and, not at all incompatibly, subsection 2 means it cannot go forward unless it meets certain construction standards," p 8, and further assert that the "including, subject to subsection (2)" language in subsection 1 makes "the implication . . . even stronger that the two subsections are to be read in combination." Pp 7-8. It is the dissent that misapprehends the relationship between subsections 1 and 2 by attempting to read these provisions in isolation and concluding that when read in this manner they compel different results and thus are "ambiguous." However, the subsections of MCL 247.183, as with all other provisions of law, are not to be read discretely, but as part of a whole. The dissent errs in first reading these subsections "alone" and then asserting that it is reading these subsections "together" when it merely combines its "alone" interpretations. *Post* at 6. Rather, to read the law as a whole, it must, in fact, be read as a whole. The interpretative process does not, as the dissent does,

17

remove words and provisions from their context, infuse these words and provisions with meanings that are independent of such context, and then reimport these context-free meanings back into the law. The law is not properly read as a whole when its words and provisions are isolated and given meanings that are independent of the rest of its provisions. This is especially true when, as here, one of these provisions *expressly cross-references* the other.

(6) Therefore, even if the existence of a reasonable disagreement *were* the standard for identifying ambiguity—which it is not—the dissent's interpretation of MCL 247.183 is simply not a reasonable one when subsections 1 and 2 are read together, as opposed to being read discretely. It cannot correctly be said that these subsections "apply to different entities," *post* at 7, when subsection 1 expressly observes that its provisions are made "subject to subsection (2)." Contrary to the mandate of this Court, the dissent fails to "give effect to every word, phrase, and clause in a statute and avoid an interpretation that would render any part of the statute surplusage," *State Farm & Cas Co v Old Republic Ins Co*, 466 Mich 142, 146; 644 NW2d 715 (2002), by essentially ignoring the term

18

"including subject to subsection (2)" in its interpretation.

(7) The dissent further asserts that MCL 267.183 is ambiguous because "application of the statute to the facts has rendered the correct application of the statute uncertain." *Post* at 4. It is hard to know what this means. While any interpretation of the law is in some sense "fact specific," the dissent fails to identify *why* the interpretation of this statute, any more than any other statute, is rendered ambiguous by the instant facts. This majority's view of the law is that, *whenever* a public utility constructs a pipeline or other utility project longitudinally within limited access highway rights-of-way, MCL 247.183 requires that the utility must both obtain the consent of the local governing body (subsection 1) *and* construct the pipeline in accordance with state and federal standards (subsection 2). Is it the dissent's view that its interpretation pertains in some instances but not in others? If not, what is the relevance of the dissent's observation that its interpretation is "fact specific"?

(8) Moreover, even if MCL 247.183 were truly ambiguous, the dissent's analysis of what it views as the relevant legislative history is altogether unpersuasive. In *In re Certified Question* (*Kenneth Henes v Continental*

19

*Biomass Ind, Inc*), 468 Mich 109, 115 n 5; 659 NW2d 597 (2003), this Court emphasized that not all legislative history is of equal value, which "results in varying degrees of quality and utility of legislative history." There, we stated that examples of "the highest quality of legislative history that relates to an action of the Legislature from which a court may draw reasonable inferences about the Legislature's intent with respect to an ambiguous statutory provision" are "actions of the Legislature intended to repudiate the judicial construction of a statute" or "actions of the Legislature in considering various alternatives in language in statutory provisions before settling on the language actually enacted." *Id*. It is noteworthy that the dissent fails to rely on legislative history of either type. Instead, the dissent largely relies on the least persuasive form of legislative history—staff analyses—which we have found are of "considerably diminished quality," and thus "are entitled to little judicial consideration in resolving ambiguous statutory provisions . . . ." *Id*.[8]

---

[8] "The problem with relying on bill analyses is that they do not necessarily represent the views of even a single legislator. Rather, they are prepared by House and Senate staff. Indeed, the analyses themselves note that they do not constitute an official statement of legislative
(continued…)

(9) Even examining this legislative history on the dissent's own terms, we are perplexed about how it supports the dissent's position. For example, the dissent cites the fact that "SB 1008 was passed without a single 'nay' vote in either the House or Senate . . . ." *Post* at 15. How does this fact, this bit of legislative history, support the dissent's understanding of the law, i.e., that the Legislature did not intend that utilities must obtain local consent before constructing utility projects in longitudinal highway rights-of-way? How does this demonstrate anything more than that the Legislature unanimously approved the statute being considered today?[9]

Similarly, we believe that the dissent misapprehends the "changes" in which "the Department of Transportation

---

(…continued)
intent." *Frank W Lynch & Co v Flex Technologies, Inc*, 463 Mich 578, 588 n 7; 624 NW2d 180 (2001).

[9] Our confusion over the dissent's analysis of legislative history is heightened by its assertion that "the 1994 statutory amendment transformed Michigan from a state that generally did not allow entities to use limited access highway rights-of-way to a state that generally does allow the use of limited access highway rights-of-way, even though that use is subject to the requirements contained in subsection 2." *Post* at 9. This seems to us not only incorrect, but also contrary to the dissent's own prior analysis, *post* at 8, in which it notes that pre-1994 subsection 2 *did* allow use of rights-of-way by federally defined utilities.

21

and the major state utilities concurred" when SB 1008 was passed.  *Post* at 16.  The dissent suggests that the "changes" concerned the overall effect the bill would have on utility projects constructed in limited access highway rights-of-way.  However, when read in context, it appears that the "changes" concerned only the "minor amendments" made by the House of Representatives to SB 1008 concerning the fee structure for such projects.  *Id*.

In fact, when we look at the most valuable type of legislative history available to us, that is, the actual change in statutory language made by the Legislature in 1994, we find support for our view, rather than the dissent's.  Regardless of the vote count, the change that was enacted turned "*except* longitudinally within limited access highway rights-of-way" to "*including*, subject to subsection (2), longitudinally within limited access highway rights-of-way."  We find this legislative action to be a strong indication that the "true intent" of the drafters was to *include* such projects in both subsections, rather than *exclude* them from subsection 1.

Finally, while we agree with the dissent that the 1994 amendments were intended to "eliminate the ability of the state to deny access to these locations for construction of utility services," the dissent relies on this statement to

support its proposition that "[i]f the [1994] amendment were meant to remove the state's power to deny access to these locations, it certainly could not have meant to grant this power to local entities . . . ." *Post* at 16-17. Perhaps, the dissent's assertion is correct, but it is hardly self-evident. There is nothing that logically impels the conclusion that authority is to be denied the locality if it is to be denied the state. While the dissent, and perhaps some justices in this majority, might question the wisdom of a policy that treats the state and localities differently in terms of the approval required for utility pipeline construction, it is hardly inconceivable that a Legislature committed to local control or to the principle of subsidiarity might adopt exactly such a policy.[10]

---

[10] Although not directly applicable to this case because I-96 is a federal highway and, thus, not a highway "of" the city, perhaps the Legislature intended to require local approval because such approval had been a longstanding part of Const 1963, art 7, § 29, which provides in relevant part:

No person, partnership, association or corporation, public or private, operating as a public utility shall have the right to the use of the highways, streets, alleys or other public places of any county, township, city or village for wires, poles, pipes, tracks, conduits or other public utility facilities, without the consent of the duly constituted authority of the county, township, city or village . . . .

23

(10) The dissent states that "[w]hile the statute does not clearly indicate whether the Legislature intended to require federally defined utilities to obtain local consent, it appears that this lack of clarity is the result of a *clerical error* and the intent was not to reverse the 1989 elimination of local control." *Post* at 14 (emphasis added). What precisely *is* this supposed "clerical error"? What is the dissent's basis for assuming such a "clerical error" occurred? What is the evidence in support of the existence of such a "clerical error"? Is the dissent justifying its conclusion that MCL 267.183 is "ambiguous" on the basis of a "clerical error"? Or is the dissent, instead, asserting that the legislative history of MCL 267.183 not only can be considered, but that this history can supersede its very language?

(11) In the end, the essence of the dissent's analysis is its (perhaps understandable) frustrated assertion that "I cannot believe that the Legislature intended to subject federally defined public utilities to local consent requirements." *Post* at 17. This constitutes less a legal conclusion than a statement of discontent with the fact that the Legislature either had a different perspective on pipeline approval than the dissent or it failed effectively to communicate what the dissent alone knows to be its "true

24

intent."  In either case, there is no warrant for this Court replacing the words of the Legislature with those of its own.

## VI

We conclude that the plain language of MCL 247.183 requires Wolverine to obtain local consent before beginning construction of its project.  However, local consent is not required at the time of application to the PSC.  We therefore affirm the decision of the Court of Appeals in all respects.

Clifford W. Taylor
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

STATE OF MICHIGAN

SUPREME COURT

MAYOR OF THE CITY OF LANSING,
CITY OF LANSING, and INGHAM
COUNTY COMMISSIONER LISA DEDDEN,

    Appellees/Cross-Appellants,

v                                 No. 124136

MICHIGAN PUBLIC SERVICE
COMMISSION and WOLVERINE PIPE
LINE COMPANY,

    Appellants/Cross-Appellees.

_____

WEAVER, J. (*concurring*).

    I concur with the majority in all but part V of its opinion.

                         Elizabeth A. Weaver

STATE OF MICHIGAN

SUPREME COURT

MAYOR OF THE CITY OF LANSING,
CITY OF LANSING, and INGHAM
COUNTY COMMISSIONER LISA DEDDEN,

    Appellees/Cross-Appellants,

v                            No. 124136

MICHIGAN PUBLIC SERVICE
COMMISSION and WOLVERINE PIPE
LINE COMPANY,

    Appellants/Cross-Appellees.

_____

CAVANAGH, J. (*dissenting*).

Today, the majority finds no ambiguity in the statutory provision at issue and, in so doing, ignores the true intent of the Legislature. Because I believe the true intent of the Legislature must be given effect, I respectfully dissent. The majority, apparently frustrated with my refusal to follow its lead and use a dictionary while turning a blind eye to reality, has issued a lengthy response to this dissent. While the majority asserts that I substitute my own policy preferences for those of the Legislature, I think it is necessary to note the following in regard to the majority's approach: "A method of

statutory interpretation that is deliberately uninformed, and hence unconstrained, increases the risk that the judge's own policy preferences will affect the decisional process." *Bedroc Limited, LLC v United States*, 541 US ___, ___; 124 S Ct 1587, 1598; 158 L Ed 2d 338 (2004) (Stevens, J., *dissenting*).

This case requires us to examine MCL 247.183 to determine whether defendant Wolverine Pipe Line Company (Wolverine) must obtain permission from plaintiff city of Lansing to construct a gas pipeline longitudinally in the right-of-way of an interstate highway within the city limits. The majority finds no ambiguity in the statute and, thus, holds that Wolverine must obtain local consent before constructing the pipeline. I, on the other hand, believe that the statute is ambiguous and turn to the legislative history accompanying the statute to discern the Legislature's true intent. A review of the legislative history indicates that the Legislature's intent was to create a streamlined permit system that would not require consent from each municipality a pipeline crosses. On the bases of the history of the statute itself and of the legislative history recorded when the statute was enacted, I would hold that Wolverine is not obligated to obtain local consent.

I agree with the majority that this case involves principles of statutory construction and that in construing a statute, we are required to give effect to the Legislature's intent. I also agree that legislative intent must be gleaned from the statutory text if the language is unambiguous. However, when a statute is ambiguous, judicial construction is necessary to determine its meaning. *In re MCI*, 460 Mich 396, 411; 596 NW2d 164 (1999).

A statute is ambiguous when reasonable minds can differ regarding its meaning. *Id*. My dissent in *Yellow Freight System, Inc v Michigan*, 464 Mich 21, 38; 627 NW2d 236 (2001) (Cavanagh, J., dissenting), rev'd 537 US 36; 123 S Ct 37; 151 L Ed 2d 377 (2002), vacated and remanded 468 Mich 862; 659 NW2d 229 (2003), on remand 257 Mich App 602; 669 NW2d 553 (2003), outlined the generally accepted method for making an ambiguity determination.

> [W]hen there can be reasonable disagreement over a statute's meaning, see *People v Adair*, 452 Mich 473, 479; 550 NW2d 505 (1996), or, as others have put it, when a statute is capable of being understood by reasonably well-informed persons in two or more different senses, that statute is ambiguous. See 2A Singer, Statutes & Statutory Construction (6th ed), § 45.02, pp 11-12.

While the majority in *Yellow Freight* expressly disagreed with my determination that the statute was

3

ambiguous,[1] the United States Supreme Court reversed the decision of the majority and held that the statute was ambiguous. *Yellow Transportation, Inc v Michigan*, 537 US 36, 46; 123 S Ct 371; 154 L Ed 2d 377 (2002).

My dissent in *Yellow Freight* collected cases where this Court has found statutes ambiguous.

> [T]his Court has concluded that statutes have been ambiguous when one word in the statute has an unclear meaning, see *Perez v Keeler Brass Co*, 461 Mich 602, 610; 608 NW2d 45 (2000), when a statute's interaction with another statute has rendered its meaning unclear, see *People v Denio*, 454 Mich 691, 699; 564 NW2d 13 (1997), or when application of the statute to facts has rendered the correct application of the statute uncertain, see *Elias Bros v Treasury Dep't*, 452 Mich 144, 150; 549 NW2d 837 (1996). [464 Mich 38.]

In this case, application of the statute to the facts has rendered the correct application of the statute uncertain.

---

[1] In fact, the majority made the same argument in *Yellow Freight* that they assert here:

> The dissent contends that the statute is ambiguous, asserting that this is demonstrated by "the several interpretations of its wording advanced by the parties." If the parties' conflicting interpretations were the measure of a statute's ambiguity, then almost every statute litigated would be deemed ambiguous. A statute is not ambiguous because it requires careful attention and analysis. [*Yellow Freight, supra* at 30 n 12.]

4

MCL 247.183, in pertinent part, reads:

(1) . . . public utility companies . . . may enter upon, construct, and maintain . . . pipe lines . . . upon, over, across, or under any public road, bridge, street or public place, including, subject to subsection (2), longitudinally within limited access highway rights of way, and across or under any of the waters of this state, with all necessary erections and fixtures for that purpose. A . . . public utility company . . . , before any of this work is commenced, shall first obtain the consent of the governing body of the city . . . through or along which these lines and poles are to be constructed and maintained.

(2) A utility as defined in 23 C.F.R. 645.105[] may enter upon, construct, and maintain utility lines and structures longitudinally within limited access highway rights of way in accordance with standards approved by the state transportation commission that conform to governing federal laws and regulations. . . .

The majority's statutory analysis begins and ends with the dictionary definition of "subject to." The majority concludes that "subject to" does "not mean that the requirements of subsection 1 do not apply to those utilities that are covered also by subsection 2." *Ante* at 8. While the majority uses a double negative to hedge, I think the more direct statement to be gleaned from the inclusion of "subject to" in subsection 1 and its conspicuous absence from subsection 2 is that subsection 2 utilities may not be "subject to" the requirements of subsection 1. Because subsection 2 utilities are a

5

specific group of federally defined utilities that are subject to regulations beyond those imposed on the broad general utilities in subsection 1, I think it is fair to say that the Legislature may have intended to create a regulatory scheme specific to the more-regulated entities.

Thus, it is unclear whether the requirement in subsection 1, that public utility companies must obtain local consent, applies to a utility, as defined in subsection 2. When reading subsection 1 alone it appears that all public utilities must obtain local consent before constructing pipelines in any public place. When reading subsection 2 alone, however, it appears that federally defined utilities may construct pipelines longitudinally within limited access highway rights-of-way as long as they comply with the applicable state standards. When the two sections are read together, it is unclear whether subsection 2 utilities must comply with the local consent requirement in subsection 1.

"It is a well-established rule of statutory construction that provisions of a statute must be construed in light of the other provisions of the statute to carry out the apparent purpose of the Legislature." *Farrington v Total Petroleum, Inc*, 442 Mich 201, 209; 501 NW2d 76 (1993). Here, the majority fails to construe subsection 1

in light of subsection 2 and, thus, concludes that the statute is not ambiguous.

I cannot agree that the meaning of MCL 247.183 is clear and unambiguous. A statute is ambiguous if there can be reasonable disagreement over the statute's meaning. *In re MCI, supra* at 411. The meaning of this statute is subject to reasonable disagreement. There is a reasonable argument that subsection 2 imposes requirements, in addition to those imposed by subsection 1, on utilities that meet the definition of utility in 23 CFR 645.105, and that are looking to construct lines longitudinally within limited access highway rights-of-way. Under this reading of the statute, subsection 2 utilities would be required to obtain local consent.

However, there is also a reasonable argument that subsections 1 and 2 apply to different entities and that subsection 2 entities are excepted from the requirements of subsection 1. Because there are at least two reasonable interpretations of MCL 247.183, the statute is ambiguous.

When a statute is ambiguous, judicial construction is appropriate. *In re MCI*, *supra* at 411. As previously stated, it is a maxim of statutory construction that "provisions of a statute must be construed in light of the other provisions of the statute . . . ." *Farrington*, *supra*

7

at 209.   In construing subsection 1 in light of subsection 2, I find that the Legislature intended to create a special process for federally defined utilities that wish to construct pipelines longitudinally within limited access highway rights-of-way.

The statutory and legislative history further supports the conclusion that the Legislature did not intend for federally defined utilities, such as Wolverine, to have to obtain local consent before constructing pipelines longitudinally in limited access highway rights-of-way. When the statute governing construction and maintenance of pipelines was originally enacted in 1925, it did not address longitudinal rights-of-way.[2]   Until 1988, longitudinal use of interstate highway rights-of-way required a permit from the Federal Highway Administration.

---

[2] Section 13 of 1925 PA 368 provided, in pertinent part:

Telegraph, telephone, power and other public utility companies and municipalities are authorized to enter upon, construct, and maintain . . . pipe lines . . . upon, over, across, or under any public road, bridge, street or public places and across or under any of the waters in this state, with all the necessary erections and fixtures therefor: *Provided* that every such . . . public utility company . . . before any of the work of such construction and erection shall be commenced, shall first obtain the consent of the duly constituted authorities of the city, village, or township through or along which said lines and poles are to be constructed and erected.

In 1988, the federal regulations were amended to allow use of longitudinal rights-of-way in accordance with federal regulations if such use was permitted by the state. See 23 CFR 645.105.

The Michigan statute was amended in 1989 to reflect this change. 1989 PA 215. The phrase "except longitudinally within limited access rights of way" was added to subsection 1, and the Legislature also added subsection 2 to the statute.[3] Essentially, MCL 247.183(1) provided that certain entities were authorized to construct pipelines upon, over, across, or under any public place,

---

[3] When subsection 2 was added in 1989, it read:

> The state transportation department may permit a utility as defined in 23 CFR 645.105(m) to enter upon, construct, and maintain utility lines and structures longitudinally within limited access highway rights of way in accordance with standards approved by the state transportation commission. Such lines and structures shall be underground or otherwise constructed so as not to be visible. The standards shall conform to governing federal laws and regulations and may provide for the imposition of a reasonable charge for longitudinal use of limited access highway rights of way. The imposition of a reasonable charge constitutes a governmental function, offsetting a portion of the capital and maintenance expense of the limited access highway, and is not a proprietary function. All revenue received under this subsection shall be used for capital and maintenance expenses incurred for limited access highways.

9

*except* within limited access highway rights-of-way. In other words, according to subsection 1, Michigan generally did not allow longitudinal use of limited access highway rights-of-way. While general use was prohibited by subsection 1, subsection 2 allowed federally defined utilities to obtain a permit to use the rights-of-way.

In 1994, the statute was amended again. 1994 PA 306. The focus of the 1994 amendments was ensuring that it was feasible for utilities to construct in limited access highway rights-of-way. To this end, the fees that could be charged for longitudinal use of limited access highway rights-of-way were adjusted and the nature of the permit system was altered by changing the phraseology of subsection 1. In pertinent part, Senate Bill 1008 looked like this:

> Sec. 13. (1) Telegraph, telephone, power, and other public utility companies, ~~and~~ cable television companies, and municipalities ~~are authorized to~~ MAY enter upon, construct and maintain telegraph, telephone, or power lines, pipe lines, wires, cables, poles, conduits, sewers ~~and like~~ OR SIMILAR structures upon, over, across, or under any public road, bridge, street, or public place, ~~except~~ INCLUDING, SUBJECT TO SUBSECTION (2), longitudinally within limited access highway rights of way . . . .

Notably, the word "except" was replaced with the phrase "including, subject to subsection (2)." In other words, the 1994 statutory amendment changed Michigan from a

10

state that generally did not allow entities to use limited access highway rights-of-way, at least not without a permit, to a state that generally does allow use of limited access highway rights-of-way, even though that use is subject to the requirements contained in subsection 2.

Before the 1994 amendments, subsection 1 permitted pipeline construction in public areas, but prohibited construction within limited access highway rights-of-way. Subsection 1 also required local consent. Subsection 2, on the other hand, allowed the state Department of Transportation to issue permits to federally defined utilities to construct pipelines within limited access highway rights-of-way. After the 1994 amendments, subsection 1 still permits construction in public areas, but it also provides that entities may construct pipelines longitudinally within limited access highway rights-of-way. The second sentence of subsection 1 still requires utilities to obtain local consent. Subsection 2 now states that a utility may construct within limited access highway rights-of-way if the utility pays a fee and conforms to state standards that comport with the federal standards; it no longer requires a state permit from the Department of Transportation.

While the history of the statute and the amendments themselves provide some insight into the Legislature's intent, the legislative analyses and the documents contained in the House and Senate committee files provide even more insight.  I recognize that this Court has held that "a legislative analysis is a feeble indicator of legislative intent and is therefore a generally unpersuasive tool of statutory construction."  *Frank W Lynch & Co v Flex Technologies, Inc*, 463 Mich 578, 587; 624 NW2d 180 (2001).  However, this Court more recently recognized

> the benefit of using legislative history when a statute is ambiguous and construction of an ambiguous provision becomes necessary. *Stajos v City of Lansing*, 221 Mich App 223; 561 NW2d 116 (1997); *People v Hall*, 391 Mich 175; 215 NW2d 166 (1974); *Liquor Control Comm v Fraternal Order of Eagles, Aerie No 629*, 286 Mich 32; 281 NW 427 (1938). . . . Examples of legitimate legislative history include . . . actions of the Legislature in considering various alternatives in language in statutory provisions before settling on the language actually enacted.  See, e.g., *Miles ex rel Kamferbeek v Fortney*, 223 Mich 552, 558; 194 NW 605 (1923). . . .  By comparing alternative legislative drafts, a court may be able to discern the intended meaning for the language actually enacted.  [*In re Certified Question (Kenneth Henes Special Projects Procurement, Marketing and Consulting Corp v Continental Biomass Industries, Inc)*, 468 Mich 109, 115 n 5; 659 NW2d 597 (2003).]

The "various alternatives in language" examined by the Court in *Miles* were statutory amendments made over a

twenty-six year period.  In that case, this Court found it telling that the Legislature eliminated words in 1917 that were added in 1909 and remained through the 1915 amendment. The amendments were to the general election law, which at the time of the election in question required election inspectors to indorse all ballots "in ink or with indelible pencil." *Miles*, *supra* at 553.  This Court concluded that the Legislature's deletion of the words "or with lead" signified legislative intent to remove the possibility of signature with lead pencils.  *Id*. at 558, 564.

Although the Legislature added and then removed a specific term in *Miles*, that was not the case here.  *In this case*, the Legislature did not eliminate the possibility of constructing pipelines longitudinally within limited access highway rights-of-way; rather, it subjected such construction to the requirements of subsection 2 only.

It is clear from both the text of the statute and the legislative analysis of the 1989 amendment that the 1989 amendment was intended to eliminate local control. Subsection 1 of the 1989 amendment prohibited construction within limited access highway rights-of-way.  Thus, the local consent requirements of subsection 1 clearly did not apply to the prohibited actions.  See also Senate Legislative Analysis, HB 4767, October 11, 1989 ("The bill

13

would amend Public Act 365 of 1925 . . . to authorize the Department of Transportation, rather than local governing bodies, to permit the longitudinal construction of utility lines . . . within limited access highway rights-of-way. . . .")

However, the 1989 amendment of MCL 247.183 is not the language at issue because the most recent amendment of the statute was the 1994 amendment.  While the statute does not clearly indicate whether the Legislature intended to require federally defined utilities to obtain local consent, it appears that the lack of clarity is the result of a clerical error and the intent was not to reverse the 1989 elimination of local control.  The legislative analysis accompanying the 1994 amendment suggests that the purpose of the amendment was simply to ensure that it was feasible for utilities to use limited access highway rights-of-way.  This was accomplished by adjusting the fees for longitudinal use of limited access highway rights-of-way and ensuring that the state standards prevent an increase in highway maintenance costs.  See Senate Legislative Analysis, SB 1008, August 3, 1994.

The House and Senate journals provide further support for the notion that the Legislature did not intend the amendment to impose a requirement that federally defined

14

utilities obtain local consent.  The journals indicate that SB 1008 was passed without a single "nay" vote in either the House or Senate and the only amendments of the proposed bill were to subsection 2, which deals with the fees to be charged for longitudinal use of limited access highway rights-of-way.  1994 Journal of the Senate 1558, 1578; 1994 Journal of the House 1639, 1978-1979.

In addition to the journals, the standing committee records from the Senate Technology and Energy Committee and the discussions regarding the bill on the Senate floor also provide support for the notion that the Legislature did not intend to subject federally defined utilities to the local consent requirement.  The Senate Committee on Technology and Energy held a committee hearing on March 23, 1994. Included in the committee records are the Senate Legislative Analysis, an analysis of the Senate Majority Policy Office, and written testimony of General Telephone and Electronics and the Michigan Department of Transportation.

The analysis from the Senate Majority Policy Office states, "Senate Bill 1008 would amend current law to permit a utility to enter and construct utility services along the longitudinal axis of a limited access highway using standards adopted by the State Transportation Commission.

The amendatory language would also eliminate the ability of the state to deny access to these locations for construction of utility services."

Senate Bill 1008, which resulted in the 1994 amendments of the act, was introduced by Senator Hoffman. SB 1008 was introduced on February 8, 1994, and sent on to the House of Representatives on April 26, 1994. On June 12, 1994, the bill returned from the House to the Senate with minor amendments and Senator Hoffman explained the bill on the Senate Floor before a vote. He explained that the House of Representatives made two amendments to the bill concerning the fee structure for constructing in limited access highway rights-of-way. He conveyed that the Department of Transportation and the major state utilities concurred in the changes and he urged the Senate members to concur as well. Audio Tape: Michigan State Senate Session (June 21, 1994)(on file at the State of Michigan Archives).[4]

If the amendment were meant to remove the state's power to deny access to these locations, it certainly could

---

[4] Without stating what is missing from my alleged recitation of "various random facts," the majority asserts that this dissent is underinclusive. *Ante* at 12. A few breaths later, however, the majority asserts that I have included a useless "bit of legislative history." *Ante* at 20. I am at a loss for how to respond to a majority that wants everything and nothing at the same time.

not have been meant to grant this power to local entities, thus making it more cumbersome and maybe even impossible to construct within limited access highway rights-of-way. After reviewing the language used in the statute and the legislative history, I cannot believe that the Legislature intended to subject federally defined public utilities to local consent requirements.

Because I believe that the statute is ambiguous and the true legislative intent was not to require local consent when federally defined utilities wish to construct pipelines longitudinally within limited access highway rights-of-way, I must respectfully dissent.

Michael F. Cavanagh
Marilyn Kelly