# YELLOW TRANSPORTATION, INC. *v.* MICHIGAN ET AL.

No. 01–270.   Argued October 7, 2002—Decided November 5, 2002

O'Connor, J., delivered the opinion of the Court, in which Rehnquist, C. J., and Scalia, Kennedy, Souter, Thomas, Ginsburg, and Breyer, JJ., joined. Stevens, J., filed an opinion concurring in the judgment, *post*, p. 48.

*Charles A. Rothfeld* argued the cause for petitioner. With him on the briefs were *Evan M. Tager, Robert L. Bronston, John W. Bryant,* and *R. Ian Hunter.*

*Austin C. Schlick* argued the cause for the United States as *amicus curiae* in support of petitioner. With him on the brief were *Solicitor General Olson, Assistant Attorney General McCallum, Deputy Solicitor General Wallace, Michael Jay Singer, Bruce G. Forrest, Kirk K. Van Tine, Paul M. Geier, Dale C. Andrews,* and *Laura C. Fentonmiller.*

*Thomas L. Casey,* Solicitor General of Michigan, argued the cause for respondents. With him on the briefs were *Jennifer M. Granholm,* Attorney General, *Susan I. Leffler,* Assistant Solicitor General, and *David A. Voges* and *Henry J. Boynton,* Assistant Attorneys General.*

JUSTICE O'CONNOR delivered the opinion of the Court.

We granted certiorari in this case, 534 U. S. 1112 (2002), to determine whether the Michigan Supreme Court erred in

---

*\*Roy T. Englert, Jr., Sherri Lynn Wolson, Beth L. Law,* and *Robert Digges, Jr.,* filed a brief for the American Trucking Associations, Inc., et al. as *amici curiae* urging reversal.

holding that, under 49 U. S. C. § 14504(c)(2)(B)(iv)(III), only a State's "generic" fee is relevant to determining the fee that was "collected or charged as of November 15, 1991."

## I

### A

Beginning in 1965, Congress authorized States to require interstate motor carriers operating within their borders to register with the State proof of their Interstate Commerce Commission (ICC) interstate operating permits. Pub. L. 89–170, 79 Stat. 648, 49 U. S. C. § 302(b)(2) (1970 ed.). Congress provided that state registration requirements would not constitute an undue burden on interstate commerce so long as they were consistent with regulations promulgated by the ICC. *Ibid.*

Prior to 1994, the ICC allowed States to charge interstate motor carriers annual registration fees of up to $10 per vehicle. See 49 CFR § 1023.33 (1992). As proof of registration, participating States would issue a stamp for each of the carrier's vehicles. § 1023.32. The stamp was affixed on a "uniform identification cab car[d]" carried in each vehicle, within the square bearing the name of the issuing State. §§ 1023.32(d)–(e). This system came to be known as the "bingo card" system. *Single State Insurance Registration*, 9 I. C. C. 2d 610 (1993).

The "bingo card" regime proved unsatisfactory to many who felt that the administrative burdens it placed on carriers and participating States outweighed the benefits to those States and to the public. H. R. Rep. No. 102–171, pt. I, p. 49 (1991); H. R. Conf. Rep. No. 102–404, pp. 437–438 (1991). In the Intermodal Surface Transportation Efficiency Act of 1991 (ISTEA), Congress therefore directed the ICC to implement a new system to replace the "bingo card" regime.*

---

*Congress abolished the ICC in 1995 and assigned responsibility for administering the new Single State Registration System to the Secretary of Transportation. See ICC Termination Act of 1995, Pub. L. 104–88,

See Pub. L. 102–240, § 4005, 105 Stat. 1914, 49 U. S. C. § 11506(c) (1994 ed.). Under the new system, called the Single State Registration System, "a motor carrier [would be] required to register annually with only one State," and "such single State registration [would] be deemed to satisfy the registration requirements of all other States." §§ 11506(c)(1)(A) and (C). Thus, one State would—on behalf of all other participating States—register a carrier's vehicles, file and maintain paperwork, and collect and distribute registration fees. § 11506(c)(2)(A). Participation in the Single State Registration System was limited to those States that had elected to participate in the "bingo card" system. § 11506(c)(2)(D).

ISTEA also capped the per-vehicle registration fee that participating States could charge interstate motor carriers. Congress directed the ICC to

> "establish a fee system . . . that (I) will be based on the number of commercial motor vehicles the carrier operates in a State and on the number of States in which the carrier operates, (II) will minimize the costs of complying with the registration system, and (III) will result in a fee for each participating State that is equal to the fee, not to exceed $10 per vehicle, that such State collected or charged as of November 15, 1991." § 11506(c)(2)(B)(iv).

Congress provided that the charging or collection of any fee not in accordance with the ICC's fee system would "be deemed to be a burden on interstate commerce." § 11506(c)(2)(C).

§ 101, 109 Stat. 803. The provisions of ISTEA governing the system were amended and recodified. See 49 U. S. C. § 14504(c). The Federal Highway Administration, under the Secretary of Transportation, adopted the ICC regulations that implemented the Single State Registration System, 61 Fed. Reg. 54706, 54707 (1996), and the Federal Motor Carrier Safety Administration now has authority to administer the system, 49 U. S. C. § 113(f)(1).

The ICC issued its final implementing regulations in May 1993 after notice-and-comment proceedings. *Single-State Insurance Registration, supra.* The rulemaking gave rise to the central question in this case: whether, under the Single State Registration System, States were free to terminate "reciprocity agreements" that were in place under the "bingo card" regime. *Id.,* at 617–619. Under these agreements, in exchange for reciprocal treatment, some States discounted or waived registration fees for carriers from other States. *Id.,* at 617.

In issuing a set of proposed rules and soliciting further comments, the ICC questioned whether it had the power to require States to preserve pre-existing reciprocity agreements. *Single State Insurance Registration,* No. MC–100 (Sub-No. 6), 1993 WL 17833, *12 (Jan. 22, 1993); see *Single State Insurance Registration—1993 Rules,* 9 I. C. C. 2d 1, 11 (1992). It noted that these agreements were voluntary and mutually beneficial and commented that "as long as no carrier is charged more than [a State's] standard November 15, 1991, fee for all carriers (subject to the $10 limit), the requirements of [ISTEA] are satisfied." 1993 WL 17833, *12.

In its final implementing regulations, however, the ICC concluded, in light of further comments, that its preliminary view on reciprocity agreements was inconsistent with ISTEA's fee-cap provision and with "the intent of the law that the flow of revenue for the States be maintained while the burden of the registration system for carriers be reduced." *Single State Insurance Registration,* 9 I. C. C. 2d, at 618. The agency therefore determined that States participating in the Single State Registration System "must consider fees charged or collected under reciprocity agreements when determining the fees charged or collected as of November 15, 1991, as required by § 11506(c)(2)(B)(iv)." *Id.,* at 618–619; see also *American Trucking Associations—Petition for Declaratory Order—Single State Insurance Registration,* 9 I. C. C. 2d 1184, 1192, 1194–1195 (1993). The

National Association of Regulatory Utility Commissioners (NARUC) and 18 state regulatory commissions sought review of the ICC's determination and certain provisions of the Single State Registration System regulations. *NARUC v. ICC,* 41 F. 3d 721 (1994). The United States Court of Appeals for the District of Columbia concluded that the plain language of the statute supported the ICC's determination that States participating in the new system must consider reciprocity agreements under 49 U. S. C. § 11506(c)(2)(B)(iv). 41 F. 3d, at 729.

B

Prior to the implementation of the Single State Registration System, Michigan had participated in the "bingo card" regime. See App. 5 (Affidavit of Thomas R. Lonergan, Director, Motor Carrier Regulation Division of the Michigan Public Service Commission ¶ 3e) (hereinafter Lonergan Affidavit). The Michigan Legislature had directed the Michigan Public Service Commission to levy an annual registration fee of $10 per vehicle on interstate motor carrier vehicles and simultaneously endowed the commission with authority to "enter into a reciprocal agreement with a state." Mich. Comp. Laws Ann. § 478.7(4) (West 1988). Pursuant to such reciprocal agreements, the commission was empowered to "waive the fee [otherwise] required." *Ibid.*

Petitioner in this case is an interstate trucking company headquartered in Kansas. For calendar years 1990 and 1991, the Michigan Public Service Commission did not levy a fee for petitioner's trucks that were licensed in Illinois pursuant to its policy "not to charge a fee to carriers with vehicles registered in states . . . which did not charge Michigan-based carriers a fee." App. 6 (Lonergan Affidavit ¶ 3i). In 1991, however, the Michigan Public Service Commission announced a change in its reciprocity policy to take effect on February 1, 1992. Under the new policy, the commission granted reciprocity treatment based on the policies of the State in which a carrier maintained its principal place of

business rather than the State in which individual vehicles were licensed. Because Michigan had no reciprocal arrangement with Kansas, the Michigan Public Service Commission sent petitioner a bill in September 1991, levying a fee of $10 per vehicle for the 1992 registration year on petitioner's entire fleet, with payment due on January 1, 1992.

Petitioner paid the fees in October 1991 under protest and later brought suit in the Michigan Court of Claims seeking a refund of the fees it paid for its Illinois-licensed vehicles after the Single State Registration System came into effect. See 49 U. S. C. § 11506(c)(3) (1994 ed.) (setting effective date of January 1, 1994). Petitioner alleged that, because Michigan had not "collected or charged" a fee for the 1991 registration year for trucks licensed in Illinois, ISTEA's fee-cap provision prohibits Michigan from levying a fee on Illinois-licensed trucks.

On cross motions for summary disposition, the Michigan Court of Claims ruled in favor of petitioner. *Yellow Freight System, Inc.* v. *Michigan*, No. 95–15706–CM (Mar. 13, 1996) *(Yellow Freight System I)*. The Court of Claims' holding relied on an ICC declaratory order in which the agency held that ISTEA's fee-cap provision caps fees at the level "collected or charged" for registration year 1991, not those fees levied for registration year 1992 in advance of the statutory cutoff date. *Id.*, at 3–4; see *American Trucking Associations, supra*, at 1192, 1195.

The Michigan Court of Appeals affirmed on similar grounds. *Yellow Freight System, Inc.* v. *Michigan*, 231 Mich. App. 194, 585 N. W. 2d 762 (1998) *(Yellow Freight System II)*. The Court of Appeals also rejected Michigan's argument that States need not consider reciprocity agreements in determining the level of fees "charged or collected as of November 15, 1991," noting that the ICC had determined reciprocity agreements must be considered, and that the agency's decision had been upheld in *NARUC* v. *ICC, supra.*

*Yellow Freight System II, supra,* at 202–203, 585 N. W. 2d, at 766.

The Michigan Supreme Court reversed. *Yellow Freight System, Inc.* v. *Michigan,* 464 Mich. 21, 627 N. W. 2d 236 (2001) *(Yellow Freight System III).* The court concluded that "reciprocity agreements are not relevant in determining what fee [a State] 'charged or collected' as of November 15, 1991." *Id.,* at 33, 627 N. W. 2d, at 242. The court expressly rejected the District of Columbia Circuit's contrary conclusion. *Id.,* at 29, 627 N. W. 2d, at 240 (citing *NARUC* v. *ICC, supra).* The Court applied *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837 (1984), but determined that the statute unambiguously forbids the ICC's interpretation. *Yellow Freight System III,* 464 Mich., at 29–31, 627 N. W. 2d, at 240–241. Reasoning that "[t]he new 'fee system' is based not on the fees collected from one individual company, but on the fee system that the state had in place on November 15, 1991," the court concluded that "[w]e must look not at the fees paid by [petitioner] in any given year, but at the *generic fee* Michigan charged or collected from carriers as of November 15, 1991." *Id.,* at 31, 627 N. W. 2d, at 241 (emphasis added). Two justices dissented, finding ISTEA's fee-cap provision ambiguous, the ICC's construction reasonable, and deference therefore due. *Id.,* at 33–43, 627 N. W. 2d, at 242–247 (opinions of Kelly and Cavanagh, JJ.).

The Michigan Supreme Court did not consider respondents' argument that the fees petitioner paid Michigan for the 1992 registration year were "collected or charged as of November 15, 1991." 49 U. S. C. § 14504(c)(2)(B)(iv)(III). Nor did that court reach the question whether Michigan had "canceled its reciprocity agreements with other States in 1989." Brief for United States as *Amicus Curiae* 23. The only issue before this Court, therefore, is whether States may charge motor carrier registration fees in excess of those charged or collected under reciprocity agreements as of November 15, 1991.

## II

Neither party disputes that *Chevron, supra,* governs the interpretive task at hand. In ISTEA, Congress made an express delegation of authority to the ICC to promulgate standards for implementing the new Single State Registration System. 49 U. S. C. § 11506(c)(1) (1994 ed.). The ICC did so, interpreting ISTEA's fee-cap provision subsequent to a notice-and-comment rulemaking. See *United States* v. *Mead Corp.,* 533 U. S. 218, 229 (2001) ("[A] very good indicator of delegation meriting *Chevron* treatment [is an] express congressional authorizatio[n] to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed"). The Federal Highway Administration adopted the ICC's regulations, see *supra,* at 39, n., and the Single State Registration System is now administered by the Federal Motor Carrier Safety Administration. 49 U. S. C. § 113.

Accordingly, the question before us is whether the text of the statute resolves the issue, or, if not, whether the ICC's interpretation is permissible in light of the deference to be accorded the agency under the statutory scheme. If the statute speaks clearly "to the precise question at issue," we "must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U. S., at 842–843. If the statute is instead "silent or ambiguous with respect to the specific issue," we must sustain the agency's interpretation if it is "based on a permissible construction of the statute." *Id.,* at 843; see *Barnhart* v. *Walton,* 535 U. S. 212, 217–218 (2002).

ISTEA's fee-cap provision does not foreclose the ICC's determination that fees charged under States' pre-existing reciprocity agreements were, in effect, frozen by the new Single State Registration System. The provision requires that the new system "result in a fee for each participating State that is equal to the fee, not to exceed $10 per vehicle, that such State collected or charged as of November 15, 1991." 49 U. S. C. § 14504(c)(2)(B)(iv)(III). The language "collected or

charged" can quite naturally be read to mean fees that a State *actually* collected or charged. The statute thus can easily be read as the ICC chose, making it unlawful "for a State to renounce or modify a reciprocity agreement so as to alter any fee charged or collected as of November 15, 1991, under the predecessor registration system." *American Trucking Associations*, 9 I. C. C. 2d, at 1194; see *Single State Insurance Registration*, 9 I. C. C. 2d, at 618–619.

The Michigan Supreme Court held that the language of ISTEA's fee-cap provision compels a different result. Although it acknowledged that ISTEA is silent with respect to reciprocity agreements, the court nonetheless concluded that the fee-cap provision mandates that those agreements have no bearing in the determination of what fee a State "collected or charged" as of November 15, 1991. *Yellow Freight System III*, 464 Mich., at 31, 627 N. W. 2d, at 241. The court reasoned that the Single State Registration System was "based not on the fees collected from one individual company, but on the *fee system* that the state had in place." *Ibid.* (emphasis added). While such a reading might be reasonable, nothing in the statute compels that particular result.

The fee-cap provision refers not to a "fee system," but to the "fee . . . collected or charged." 49 U. S. C. § 14504(c)(2)(B)(iv)(III). Under the ICC's rule, where a State waives its registration fee, its "fee . . . collected or charged" is zero and must remain zero. The ICC's interpretation is a permissible reading of the language of the statute. And, because there is statutory ambiguity and the agency's interpretation is reasonable, its interpretation must receive deference. See *Chevron, supra*, at 843.

As commenters to the ICC during the rulemaking pointed out, to allow States to disavow their reciprocity agreements so as to alter any fee charged or collected as of November 15, 1991, would potentially permit States to increase their revenues substantially under the new system, a result that the ICC quite reasonably believed Congress did not intend.

See *Single State Insurance Registration*, 9 I. C. C. 2d, at 618. The ICC concluded that its rule best served the "intent of the law that the flow of revenue for the States be maintained while the burden of the registration system for carriers be reduced." *Ibid.* The agency considered that allowing States to disavow reciprocity agreements and charge a single, uniform fee might reduce administrative burdens, but expressed concern that carriers' registration costs, and state revenues, would balloon. *Ibid.* (noting that some carriers' fees "assertedly could increase as much as 900%," and that one commenter presented a "worst case scenario" in which "State revenues could increase from $50 million to $200 million").

Respondents argue that Congress intended for each State to set a single, uniform fee. While such a mandate would, indeed, have simplified the new system, it is not compelled by the language of the statute, which instructs the ICC to implement a system under which States charge a fee, not to exceed $10 per vehicle, that is equal to the fee such States "collected or charged as of November 15, 1991."

Respondents also contend that, by freezing the fees charged under reciprocity agreements as part of the fee cap, the ICC added a constraint not within the express language of the statute. The Michigan Supreme Court expressed a similar concern, stating that "[i]t is not for the ICC . . . to insert words into the statute." 464 Mich., at 32, 627 N. W. 2d, at 241–242. It was precisely Congress' command, however, that the ICC promulgate standards to govern the Single State Registration System, 49 U. S. C. § 11506(c) (1994 ed.), and it was thus for that agency to resolve any ambiguities and fill in any holes in the statutory scheme. See *Mead Corp., supra,* at 229; *Chevron, supra,* at 843–844. To hold States to the fees they actually collected or charged seems to us a reasonable interpretation of the statute's command that state fees be "equal to the fee, not to exceed $10 per

vehicle, that such State collected or charged as of November 15, 1991." 49 U. S. C. § 14504(c)(2)(B)(iv)(III).

Respondents argue that the ICC's rule contravenes ISTEA's fee-cap provision by limiting what a State can charge based on what was collected from or charged to a particular carrier. Respondents point out that the focus of the provision is on the actions of the State, not the actions of any particular carrier. While we agree that the statute focuses on what States "collected or charged" rather than what particular carriers paid, we do not agree that the ICC's rule focuses the inquiry on the latter. Under the "bingo card" regime, States entered into reciprocity agreements that waived or reduced fees charged to particular categories of vehicles. The ICC's rule does not necessarily cap the aggregate fee paid by any particular carrier; rather, it simply requires States to preserve fees at the levels they actually collected or charged pursuant to reciprocity agreements in place as of November 15, 1991.

Because the ICC's interpretation of ISTEA's fee-cap provision is consistent with the language of the statute and reasonably resolves any ambiguity therein, see *Chevron*, 467 U. S., at 843, the Michigan Supreme Court erred in declining to enforce it.

The judgment is therefore reversed, and the case is remanded to the Michigan Supreme Court for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, concurring in the judgment.

In my opinion there is no ambiguity in the relevant provisions of the Intermodal Surface Transportation Efficiency Act of 1991 (ISTEA). In that Act, Congress delegated to the Interstate Commerce Commission (ICC) the power to prescribe "standards" and "amendments to standards" that would create a "Single State Registration System." 49 U. S. C. § 11506 (1994 ed.). As a part of that delegation, the

ISTEA gave the ICC broad authority to establish a "fee system" that would comply with three conditions, the third of which contained two requirements.[1]  The fee for each participating State (1) may not exceed $10 per vehicle and (2) must be equal to the fee that the State "collected or charged as of November 15, 1991." § 11506(c)(2)(B)(iv)(III).

Because Michigan had both collected and charged a $10 fee in 1991—and continued to do so thereafter—the Michigan Public Service Commission did not violate either of those statutory requirements when it changed its method of determining reciprocity with respect to individual carriers.[2]  Indeed, the essential features of Michigan's fee system for 1992 were the same as they were in 1991: The amount of the fee that the "State collected or charged" was $10 per vehicle both before and after November 15, 1991; that fee was assessed on exactly the same kinds of vehicles both before and after that date; the State had reciprocal arrangements, providing for either a discount or a waiver of the fee with the same States in 1992 that it did in 1991.

Michigan did, however, violate an additional requirement imposed by the ICC when the State modified its method of determining the home State of out-of-state vehicles.  That

---

[1] "(B) RECEIPTS; FEE SYSTEM.—Such amended standards—

.          .          .          .          .

"(iv) shall establish a fee system for the filing of proof of insurance as provided under subparagraph (A)(ii) of this paragraph that (I) will be based on the number of commercial motor vehicles the carrier operates in a State and on the number of States in which the carrier operates, (II) will minimize the costs of complying with the registration system, and (III) will result in a fee for each participating State that is equal to the fee, not to exceed $10 per vehicle, that such State collected or charged as of November 15, 1991 . . . ." 49 U. S. C. § 11506(c)(2)(B)(iv) (1994 ed.).

[2] As explained by the majority, *ante*, at 42–43, Michigan changed its policy from determining reciprocity with respect to an individual vehicle based on where that vehicle was registered and had obtained a license plate to determining reciprocity based on where the trucking company that owned the individual vehicle maintained its principal place of business.

agency-imposed requirement effectively precluded a State from making a systemic change that would significantly increase its revenues. I think it clear that the statutory delegation of power to the ICC to "establish a fee system" was broad enough to include the power to impose additional requirements to ensure that a State would not impose a "burden on interstate commerce." See §§ 11506(c)(2)(B)(iv), (c)(2)(C). The rulemaking proceeding confirmed the ICC's power to require the States to preserve pre-existing reciprocity agreements to avoid a scenario in which "some States would realize windfalls." *Single State Insurance Registration,* 9 I. C. C. 2d 610, 618 (1993) (responding to comment alleging, among other things, that if reciprocity agreements were discontinued, "State revenues could increase from $50 million to $200 million"); see *ante,* at 41. Although Michigan did not abandon any reciprocity agreement, I think it equally clear that the ICC could prohibit a change in the method of implementing those agreements that would significantly increase a State's revenues, and therefore threaten to burden commerce.[3]

Thus, I concur in the Court's judgment because the statute authorized the ICC to decide that the States' pre-existing reciprocity agreements should, in effect, be "frozen." I do not, however, believe that the statute mandated that result. Nor do I believe that the additional constraint imposed by the ICC should be upheld as a permissible construction of subsection (c)(2)(B)(iv)(III). Rather, in my opinion, it was a permissible exercise of the broad authority vested in the ICC to "establish a fee system" that would not create "a burden on interstate commerce." See §§ 11506(c)(2)(B)(iv), (c)(2)(C). It is on this basis that I concur in the judgment of the Court.

---

[3] Not every change in how reciprocity is determined would lead to an increase in a State's revenues. Indeed, it may be that a State's revenues would decrease after making such a change. I am satisfied, however, that the potential for an increase in these circumstances is a sufficient threat to burden commerce within the meaning of the statute.