CAVANAGH, J.
(dissenting). Contrary to the majority’s refusal to recognize as much, equitable tolling[1] is a time-honored, purposeful, and carefully crafted rule of equity that is employed when rare but compelling circumstances so justify its use. In Lewis v DAIIE, 426 Mich 93; 393 NW2d 167 (1986), the latest case to fall prey to the majority’s chopping block, this Court employed this important mechanism for critical and justifiable equitable reasons that the current majority carelessly relegates to oblivion under an overwrought — and unnecessary — cloak of textualism. What the majority unfortunately fails to recognize is that judicial tolling needs no basis in statutory language. It is an equitable measure. Thus, the majority’s ardent devotion to the strict language of the statute is admirable, but really quite misplaced. As a result, the majority unnecessarily ties the judiciary’s hands from importing measures of equity in situations that require it. Because I believe that the judicial tolling rule established in Lewis was well-reasoned and necessary, and because the majority has not established a persuasive reason for disregarding twenty years of stare decisis, I respectfully dissent.
I. EQUITABLE TOLLING IS AN EQUITABLE REMEDY THAT NEEDS NO BASIS IN STATUTORY LANGUAGE
The long-recognized equitable remedy of judicial tolling has been applied in a variety of circumstances. In *595 fact, “[t]ime requirements in lawsuits between private litigants are customarily subject to ‘equitable tolling[.]’ ” Irwin v Dep’t of Veterans Affairs, 498 US 89, 95; 111 S Ct 453; 112 L Ed 2d 435 (1990), quoting Hallstrom v Tillamook Co, 493 US 20, 27; 110 S Ct 304; 107 L Ed 2d 237 (1989). This “breakfs] [no] new ground.” American Pipe & Constr Co v Utah, 414 US 538, 558; 94 S Ct 756; 38 L Ed 2d 713 (1974). Rather, equitable tolling operates to relieve the “strict command” of a legislatively prescribed limitation because of “considerations ‘[d]eeply rooted in our jurisprudence.’ ” Id. at 559, quoting Glus v Brooklyn Eastern Terminal, 359 US 231, 232; 79 S Ct 760; 3 L Ed 2d 770 (1959).
For instance, “in cases where the plaintiff has refrained from commencing suit during the period of limitation because of inducement by the defendant, [Glus, supra] or because of fraudulent concealment, Holmberg v Armbrecht, 327 US 392[; 66 S Ct 582; 90 L Ed 743 (1946)], this Court has not hesitated to find the statutory period tolled or suspended by the conduct of the defendant.” American Pipe, supra at 559. See also Irwin, supra at 96 (recognizing that the remedy of equitable tolling can be afforded even where a plaintiff files a defective pleading within the statutory time period); In re MGS, 756 NE2d 990, 997 (Ind App, 2001) (recognizing that equitable tolling was an available remedy to a statute of limitations); Harsh v Calogero, 615 So 2d 420, 422 (La App, 1993) (acknowledging the doctrine of contra non valentem)\ Regents of the Univ of Minnesota v Raygor, 620 NW2d 680, 687 (Minn, 2001) (holding that equitable tolling is an available equitable remedy under the proper circumstances), aff'd 534 US 533; 122 S Ct 999; 152 L Ed 2d 27 (2002); Friedland v Gales, 131 NC App 802, 806-809; 509 SE2d 793 (1998) (recognizing equitable estoppel of a statute of limitations defense); Resolution Trust Corp v Grant, 901 P2d *596 807, 812 nn 13, 16 (Okla, 1995) (noting that the doctrine of adverse domination is “widely applied” by federal courts, and collecting cases from eleven states recognizing the doctrine).
Most recently, our Michigan Court of Appeals observed the following:
This Court in United States Fidelity & Guaranty Co v Amerisure Ins Co, 195 Mich App 1, 6; 489 NW2d 115 (1992), noted that “Michigan and federal case law provides precedent for the principle that limitation statutes are not entirely rigid, allowing judicial tolling under certain circumstances!.]”
In Bryant [v Oakpointe Villa Nursing Ctr, Inc, 471 Mich 411, 432; 684 NW2d 864 (2004)], Justice MARKMAN, writing for the majority, applied the principles of the doctrine of equitable tolling in a medical malpractice action, while not specifically referring to the doctrine by name!.]
Equitable tolling has been applied where “the plaintiff actively pursued his or her judicial remedies by filing a defective pleading during the statutory period or the claimant has been induced or tricked by the defendant’s misconduct into allowing the filing deadline to pass.” [Ward v Rooney-Gandy, 265 Mich App 515, 518-520; 696 NW2d 64 (2005), quoting 51 Am Jur 2d, Limitation of Actions, § 174, p 563.]
Thus, applying equitable tolling is neither a novel measure nor one employed by cunning judicial activists seeking to advance their personal philosophies, as the majority implies. Although equitable tolling must be sparingly applied, Irwin, supra at 96, equitable remedies are, nonetheless, entirely within the sanctioned parameters of the judiciary’s powers. Indeed, when the circumstances dictate the need, it is the obligation of *597 the judiciary to mete out the appropriate justice. See, e.g., Howard v Mendez, 304 F Supp 2d 632, 638-639 (MD Pa, 2004) (concluding that “common sense requires tolling of the limitations period when a litigant’s right to file suit depends on the timely conduct of the opposing party’s agent in assisting in the exhaustion of mandatory administrative remedies”); Harris v Hegmann, 198 F3d 153, 158-159 (CA 5, 1999) (recognizing a Louisiana “judicial rule” that tolls the limitations period during the time in which a plaintiff is legally unable to act).
The considerations behind equitable tolling tip the scales in favor of the remedy even when a statute requires strict construction and the tolling will result in the waiver of governmental immunity. For example, in Irwin, supra at 95-96, the United States Supreme Court found that statutes of limitations that operated against the government, like those that operate against private parties, should be subject to the already existing rebut-table presumption of equitable tolling. This was true despite the fact that the civil rights statute at issue, 42 USC 2000e-16(c), had to be strictly construed because compliance with the statute was a condition to a waiver of sovereign immunity. Irwin, supra at 94. The Supreme Court duly recognized that “ ‘Congress was entitled to assume that the limitation period it prescribed meant just that period and no more.’ ” Id., quoting Soriano v United States, 352 US 270, 276; 77 S Ct 269; 1 L Ed 2d 306 (1957). But despite this important restriction, the Court found that the period of limitations should be equitably tolled when the circumstances of a particular case warranted it. The Court explained that although this type of equitable relief should be afforded only in rare instances, it is justified “in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, *598 or where the complainant has been induced or tricked by his adversary’s misconduct into allowing the filing deadline to pass.” Id. at 96; see also 51 Am Jur 2d, Limitation of Actions, § 174, p 563 (“The time requirements in lawsuits between private litigants are customarily subject to equitable tolling if such tolling is necessary to prevent unfairness to a diligent plaintiff.”).[2]
Equitable tolling is precluded, however, if a claimant does not “exercise due diligence in preserving his legal rights.” Irwin, supra at 96, citing Baldwin Co Welcome Ctr v Brown, 466 US 147, 151; 104 S Ct 1723; 80 L Ed 2d 196 (1984). With regard to the particular claim before it in Irwin, the Supreme Court found that the plaintiffs untimeliness was “at best a garden variety claim of excusable neglect,” and, thus, equitable tolling was not available in that circumstance. Irwin, supra at 96.
Of course, equitable tolling must be consonant with the legislative purpose of a statute to which it is applied. American Pipe, supra at 559, see also 54 CJS, Limitations of Actions, § 86, p 122 (“In order to serve the ends of justice where technical forfeitures would unjustifiably prevent a trial on the merits, the doctrine of equitable tolling may be applied to toll the running of the statute of limitations, provided it is in conjunction with the legislative scheme.”). And the legislative branch is free to indicate that it does not want equitable tolling to apply to any particular statute. Irwin, supra at 96. In the absence of such an indication here, equitable tolling is available, as long as the reasons for *599 applying the remedy serve a justifiable purpose and comport with legislative intent.
II. APPLYING EQUITABLE TOLLING TO MCL 500.3145(1) IS NECESSARY TO PREVENT UNJUST RESULTS AND TO EFFECT LEGISLATIVE INTENT
In Lewis, this Court thoroughly examined the purposes of statutes of limitations, the purposes of and legislative intent behind the no-fault act, and the parameters and conditions of employing equitable tolling before invoking the delicately chosen remedy. This Court did not misapprehend that the statute at issue was in some way ambiguous or that the text of the statute contained a tolling requirement.[3] Rather, after careful consideration, we concluded that an equitable measure was necessary to further the purposes of the no-fault act and to eliminate the statute’s inherent blockade to an insured’s right to receive what is rightfully his.
Nothing about the purpose of the act, the purpose of the time limitation in the act, or the parameters of equitable tolling have changed since Lewis to justify *600 overruling that well-reasoned case. Tellingly, the only variable that has fluctuated is the makeup of this Court.
As we recognized in Lewis, one of the foremost underlying purposes of our no-fault scheme was to reduce litigation. Lewis, supra at 101-102, citing Welton v Carriers Ins Co, 421 Mich 571, 578-579; 365 NW2d 170 (1984). Of equal importance, the act
was offered as an innovative social and legal response to the long payment delays, inequitable payment structure, and high legal costs inherent in the tort (or “fault”) liability system. The goal of the no-fault insurance system was to provide victims of motor vehicle accidents assured, adequate, and prompt reparation for certain economic losses. [Shavers v Attorney General, 402 Mich 554, 578-579; 267 NW2d 72 (1978) (emphasis added).]
The portion of the no-fault act at issue in Lewis and being reexamined in the present case, MCL 500.3145(1), governs when an insured must bring suit to recover benefits due under the act. The statute states in pertinent part:
An action for recovery of personal protection insurance benefits payable under this chapter for accidental bodily injury may not be commenced later than 1 year after the date of the accident causing the injury unless written notice of injury as provided herein has been given to the insurer within 1 year after the accident or unless the insurer has previously made a payment of personal protection insurance benefits for the injury. If the notice has been given or a payment has been made, the action may be commenced at any time within 1 year after the most recent allowable expense, work loss or survivor’s loss has been incurred. However, the claimant may not recover benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced. \Id. (emphasis added).]
*601 Simply stated, an insured who has received benefits or requested his insurer to pay recoverable expenses has one year after the most recent allowable expense or loss was incurred to sue the insurer to recover those benefits. Thus, as long as expenses are being incurred, the time for bringing a lawsuit is not restricted. However, the insured will only be permitted to recover benefits that were incurred in the one-year period before the suit was brought.
Once an insured submits a claim for benefits, she has no way of knowing, other than an indication from the insurer, whether the claim will be paid. Quite obviously, then, when an insured acts with due diligence in notifying the insurance company of a claim, whether the insured ultimately collects the full amount of benefits due is completely at the whim of the insurance company. When an insured submits a claim for benefits, an insurer can take as long as it wants to approve or deny the claim. If the insurer takes more than one year, then under the one-year-back rule, the benefits that were due to the insured dissipate into thin air through no fault whatsoever of the insured.
Indeed, that was precisely what occurred in this case. After plaintiffs son was catastrophically injured in an automobile accident, defendant began paying plaintiff for her attendant care services. Defendant paid those benefits for approximately a year and a half. But a day after receiving a February 15, 2001, physician’s notice that Michael had been “cleared to function without close supervision,” defendant abruptly stopped paying benefits. Defendant waited, however, until October 7, 2002, to notify plaintiff that it was formally denying further benefits.
Shortly thereafter, on November 12, 2002, plaintiff filed a complaint to recover the benefits defendant had *602 ceased paying.[4] But under MCL 500.3145(1), plaintiff could only recover benefits from the one-year period that preceded her complaint, November 12, 2001, to November 12, 2002, even though defendant allegedly wrongfully withheld benefits beginning on February 16, 2001. Thus, if plaintiff was entitled to benefits from the period February 16, 2001, to November 12, 2001, the one-year-back rule precluded her from recovering them, even though plaintiff was allegedly diligent in providing notice of her claim to her insurer.[5]
Plaintiffs case aptly demonstrates the need for equitable tolling. Her insurer waited nearly two years to formally deny her claim for attendant benefits. Although plaintiff could have brought suit earlier, before defendant formally denied her claim, such a tactic hardly advances our Legislature’s goal of reducing litigation. In fact, it appears from the limited record before us that plaintiff and defendant were involved in extensive dealings and communication regarding many types of benefits from the time plaintiffs son was injured onward.[6] An insured engaged in the complex *603 day-to-day dealings with an insurer that are common after a serious accident would quite conceivably destroy any semblance of goodwill and cooperation by filing a lawsuit before the insurer has even denied a particular claim. Further, an insurer could simply defend by stating that the plaintiffs claim is premature because the insurer is still investigating the claim, at which point the lawsuit would not only have precipitated antagonism, but would have amounted to a colossal waste of time and resources.
Insurers, too, are hurt by today’s ruling. With the proliferation of litigation that is now bound to occur, insurers will be paying the costs of defending the lawsuits, and converting resources that could otherwise go toward investigating claims and communicating with their insureds into payments for billable hours. This will, in turn, translate into higher premiums, further denigrating the opposite goal of the no-fault act.
How the majority’s abandonment of equitable tolling in this situation furthers the legislative intent behind the no-fault act escapes me.
Defendant claims that a deterrent mechanism that would encourage an insurer to promptly deny claims is built into the no-fault act and that, as such, equitable tolling is unnecessary. I disagree. While §§ 3142(3) and 3148(1) penalize the insurer for unreasonable delay or unreasonable denials by attaching interest to overdue payments and making the insurer liable for an insured’s attorney fees, those provisions fall short of protecting insureds against the unavoidable effects of insurer delay. Once benefits become unreachable *604 through operation of the one-year-back rule, the benefits cannot form apart of a plaintiffs claim. Thus, they cannot be a part of the plaintiffs award. Therefore, not only is the plaintiff deprived of a part of her benefits, she is also deprived of the purportedly punitive interest that should have accompanied it.
Further, a savvy insurer seeking to disburse the lowest dollar amount possible might gamble on a cost-benefit approach and use the one-year-back rule in its favor. For example, assume an insured seeks benefits that, over one year, total $100,000. If the insurer waits two years to deny the claim, the insured, although due $200,000, can only recover $100,000 in a lawsuit. A twelve percent annual interest rate will be applied to the $100,000 figure pursuant to § 3142(3), which makes the insurer’s total bill approximately $112,000. Thus, the insurer handily pockets $88,000 of its insured’s benefit money, less the plaintiffs attorney fees. Either way, the insured ends up with $112,000 instead of the $200,000, plus interest, that was actually owed.[7]
Lest anyone argue otherwise, the danger of such a scenario is real, not imagined. In Hudick v Hastings Mut Ins Co, 247 Mich App 602, 610; 637 NW2d 521 (2001), the Court of Appeals found an acute need for Lewis’s equitable tolling rule when, “[although defendant had all the information it needed at this point to calculate the benefits it owed to plaintiff, defendant did not process a claim for plaintiff or formally deny its liability until” a time that precluded the plaintiff from recovering some of the benefits owed. The Hudick panel correctly observed that the “[p]laintiff should not be *605 penalized for the time that the two insurers spent investigating the issue, which was extended largely because defendant was aware of its statutory duty but attempted to run the clock on the limitations period.” Id. Such tactics were also forewarned in William H Sill Mortgages, Inc v Ohio Cas Ins Co, 412 F2d 341, 346 (CA 6, 1969) (“The insurer may not lull the insured to sleep by promises of payment or negotiations for payment or a failure to deny liability until after the time limitation has expired and then set up as a defense the failure to bring the action within the limitation fixed by the policy.”).
The majority claims that the “only delay possible under the no-fault law is the thirty-day payment period following receipt of proof of loss by the insurer.” Ante at 583 (emphasis added). This is incorrect. While § 3142(2) does technically require insurers to pay benefits within thirty days, insurers do not always do so. Thus, delays of more than thirty days are indeed “possible.”
The ways in which equitable tolling fulfill the purposes of the no-fault act, and the unjustifiable ramifications of disallowing the remedy, have been eloquently presented in precedent. In Richards v American Fellowship Mut Ins Co, 84 Mich App 629, 635; 270 NW2d 670 (1978), the Court of Appeals stated:
Applying the approach taken by the Thomas Court [Tom Thomas Org, Inc v Reliance Ins Co, 396 Mich 588; 242 NW2d 396 (1976)] to § 3145 would effectuate the legislative intent in enacting the no-fault act. Unable to profit from processing delays, insurance companies will be encouraged to promptly assess their liability and to notify the insured of their decision. At the same time, the insured will have a full year in which to bring suit.
The Richards Court recognized the ramifications of disallowing tolling:
*606 If we were to accept defendant’s interpretation of the statutory provision, we would in effect be penalizing the insured for the time the insurance company used to assess its liability. To bar the claimant from judicial enforcement of his insurance contract rights because the insurance company has unduly delayed in denying its liability would run counter to the Legislature’s intent to provide the insured with prompt and adequate compensation. [Id. at 634 (emphasis added).]
In Lewis, this Court correctly found that equitable tolling served the inherent purposes of the no-fault act by ensuring that an insurer’s delay in handling a claim would not work to the insured’s detriment:
“Tolling the statute when the insured submits a claim for specific benefits would not appear to detract from the policies underlying the one-year limitation on recovery. By submitting a timely and specific claim, the insured serves the interest in preventing stale claims by allowing the insurer to assess its liability while the information supporting the claim is relatively fresh. A prompt denial of the claim would barely affect the running of the limitation period, while a lengthy investigation would simply ‘freeze’ the situation until the claim is eventually denied. In effect, the insured would be charged with the time spent reducing his losses to a claim for specific benefits plus the time spent deciding whether to sue after the claim is denied.” [Lewis, supra at 101, quoting Welton, supra at 578-579.]
This Court also correctly recognized that without tolling, an insured will have to “file suit as a precautionary measure when the one-year deadline approached], regardless of the status of the claim,” and that such needless litigation contravenes the no-fault act’s purpose of reducing litigation. Lewis, supra at 102, citing Cassidy v McGovern, 415 Mich 483, 501; 330 NW2d 22 (1982).
Of course, equitable tolling is not “an unconditional gift to the insured.” Norfolk & W R Co v Auto Club Ins *607 Ass’n, 894 F2d 838, 843 (CA 6, 1990). Astute about the need to prevent an insured from improperly benefiting from equitable tolling, the Lewis Court also warned that to take advantage of tolling, the insured “must seek reimbursement with reasonable diligence ... .” Lewis, supra at 102. That condition, held the Court, would “alleviate the defendant’s fear that adoption of the tolling principle will result in ‘open-ended’ liability in cases in which the claimant, having made a specific claim for benefits, thereafter refuses to respond to the carrier’s legitimate requests for more information needed to process the claim.” Id. at 102-103.[8]
Further, it is nothing short of illogical not to require an insurer to deny a claim before imposing a restriction on what plaintiff can recover. A plaintiff must know that a claim exists before being required to file one. Repudiating equitable tolling imposes a tremendous burden on plaintiffs, who must assert that the insurer’s failure to pay is a definitive denial and, thus, a violation of the no-fault act, rather than just the result of a pending investigation. A defense motion for failure to state a claim puts a plaintiff in an unnecessarily precarious position.
These many concerns are not lost on other states that have been faced with similar problems. In Entzion v Illinois Farmers Ins Co, 675 NW2d 925, 929 (Minn App, 2004), the court concluded that the period of limitations on a no-fault benefits claim did not begin to run until the insurer denied benefits. In Micha v Merchants Mut Ins Co, 94 AD2d 835, 836; 463 NYS2d 110 (1983), the *608 court determined that the period of limitations started when benefits were withheld. Both courts recognized that it would be irrational to require a plaintiff to prove that benefits were owed before an insurer actually refused to pay them. Refusing to apply equitable tolling to § 3145 requires plaintiffs to sue defensively, creating an irreconcilable conflict with the legislative goal of reducing litigation.
Interestingly, the necessity for equity of this sort has been recognized by this very majority most recently in Bryant v Oakpointe Villa Nursing Ctr, Inc, 471 Mich 411; 684 NW2d 864 (2004). In Bryant, this Court concluded that the “[pjlaintiff s failure to comply with the applicable statute of limitations [was] the product of an understandable confusion about the legal nature of her claim, rather than a negligent failure to preserve her rights.” Id. at 432. Thus, this Court held that, although the plaintiffs claims would have, normally been time-barred,'“[t]he equities of this case ... compel a different result.” Id.
If the judiciary can employ its powers to toll a period of limitations because the nature of one’s claim is a source of confusion, then certainly here, where an insurer can single-handedly orchestrate a reduction in genuinely owed benefits, equity is likewise required. The majority’s newfound hostility to the doctrine is vastly disturbing.[9]
*609 Further, the majority’s automaton-like textualist analysis takes no consideration of the realities surrounding no-fault claims and payments illustrated by amicus curiae Coalition Protecting Auto No-Fault. For instance, when an insured does not file a lawsuit within one year of receiving medical treatment, the insured’s medical providers may go unpaid, merely because the insurer has not responded to the request for benefits. This risk of nonrecovery or substantially reduced payments may prove too great for providers to bear. Medical providers may resort to denying treatment to and even suing their own patients, many of whom will not be able to pay because of the high cost of medical care, and some of whom may be forced into bankruptcy because of the debt. The overflow of health-care costs will be foisted on our already overtaxed Medicaid and Medicare systems, with the taxpayers ultimately shouldering the burden. Thus, refusing to apply equitable tolling will ultimately increase overall health-care costs for everyone, denigrating yet another goal of the no-fault system: affordable premiums.
In its response to my dissent, the majority does a fine job of describing the principles of equity. Noticeably lacking, however, is any attempt to describe why equity *610 is not required in the present case.[10] The majority’s chosen ignorance of the fact that its application of the statute at hand does not further the intent of the Legislature or the purpose of the no-fault act, and that it unjustifiably puts an insured’s ability to recover benefits in an insurer’s hands, is convenient for the majority, but disturbing to me.
The application of equitable tolling strikes an extremely palatable balance between the rights of insureds and insurers.[11] As I stated in Secura:
The legislative purposes behind limitation provisions, preventing stale claims and easing crowded dockets, are either inapplicable or contrary to the majority’s decision. First, preventing stale claims from reaching oür courts is not a consideration in this case, because the defendant insurer can protect itself from stale claims by promptly responding to a policyholder’s claim. Thus, whether insurers must deal with stale claims is uniquely within their own control. Next, the majority’s interpretation actually encourages needless litigation. Under the majority’s decision, a prudent policyholder must file suit within one year of the injury, regardless of whether the insurer is still processing the claim, or lose the claim altogether. This contravenes an *611 important motivation for the no-fault system, reducing litigation, see Cassidy v McGovern, 415 Mich 483, 501; 330 NW2d 22 (1982), and the similar judicial policy of discouraging litigation. See Alexander v Gardner-Denver Co, 415 US 36; 94 S Ct 1011; 39 L Ed 2d 147 (1974). Additionally, requiring a precautionary suit by the policyholder could adversely affect the negotiations between the claimant and the insurer. Negotiating parties usually attempt to maintain a cooperative atmosphere, and litigation pending between the parties would hinder that atmosphere. See Johnson v Railway Express Agency, 421 US 454, 468; 95 S Ct 1716; 44 L Ed 2d 295 (1975) (Marshall, J., dissenting). [Secura, supra at 391 (Cavanagh, J., dissenting).][12]
Defendant’s magniloquent predictions of the demise of our entire no-fault system barring reversal of Lewis are sheer melodrama. First, Lewis was decided nearly twenty years ago, and no-fault remains alive and well.[13] Surely if equitable tolling were destined to bring our no-fault system to its knees, the system would be six feet under by now. Second, defendant claims that the prolific number of multimillion dollar claims being wreaked on the insurance companies as a result of equitable tolling create great pressure on insurers to settle. But an insurer is in the best position to avoid the accrual of multimillion dollar claims by promptly paying or denying benefits. Further, the Lewis decision does not allow an insured to sleep on his rights, as evidenced by the numerous decisions in which plaintiffs who did not diligently pursue their claims were denied the benefit of equitable tolling and those in which the insurer’s prompt denial prevented tolling. See, e.g., *612 Bomis v Metropolitan Life Ins Co, 970 F Supp 584, 588 (ED Mich, 1997) (rejecting the plaintiffs Lewis argument because the plaintiff did not act with due diligence); Morley v Automobile Club of Michigan, 458 Mich 459, 470; 581 NW2d 237 (1998); Grant v AAA Michigan/Wisconsin, Inc, 266 Mich App 597; 703 NW2d 196 (2005); Mt Carmel Mercy Hosp v Allstate Ins Co, 194 Mich App 580, 587-588; 487 NW2d 849 (1992); Mousa v State Auto Ins Cos, 185 Mich App 293, 294-295; 460 NW2d 310 (1990) (finding a formal denial of benefits when the plaintiff admitted that the insurer had orally denied the claim); Long v Titan Ins Co, unpublished opinion per curiam of the Court of Appeals, issued June 14, 2005 (Docket No. 260113); Detroit Medical Ctr-Sinai-Grace Hosp v Titan Ins Co, unpublished opinion per curiam of the Court of Appeals, issued March 10, 2005 (Docket No. 251447); Inhulsen v Citizens Ins Co, unpublished opinion per curiam of the Court of Appeals, issued March 30, 2004 (Docket No. 243398); Jevahirian v Progressive Cas Ins Co, unpublished opinion per curiam of the Court of Appeals, issued April 27, 1999 (Docket No. 205577) (“Notice of an injury that simply informs the insurer of the name and address of the claimant and the time, place, and nature of an injury cannot serve as the specific claim that triggers tolling because it does not inform the insurer of the expenses incurred, whether the expenses were covered losses, and whether the claimant would file a claim.”).
In other words, equitable tolling has worked. As can clearly be seen, equitable tolling puts neither the insured nor the insurer in an untenable or unfair position. Rather, it protects both parties by requiring both to act promptly. When a party fails to act promptly, the law will not reward that party. With these safeguards in place, the purposes of the no-fault act are realized *613 instead of defeated. But with the majority’s obstinate rejection of equitable tolling will come the temptation to prolong denying claims, lost benefits, a proliferation of litigation, unpaid providers, and increased costs for everyone. Such a ruling is simply unjustifiable.
III. THE LEGISLATURE HAS NOT REVISED MCL 500.3145 SINCE LEWIS
Despite amending the no-fault act several times since this Court’s decision in Lewis, the Legislature has left untouched the language at issue in this case. Thus, this case is an ideal candidate for applying the long-recognized legislative reenactment rule. See, e.g., Massachusetts Mut Life Ins Co v United States, 288 US 269, 273; 53 S Ct 337; 77 L Ed 739 (1933). As I have previously explained,
[u]nder the reenactment rule, “[i]f a legislature reenacts a statute without modifying a high court’s practical construction of that statute, that construction is implicitly adopted.” People v Hawkins, 468 Mich 488, 519; 668 NW2d 602 (2003) (Cavanagh, J., dissenting), citing 28 Singer, Statutes and Statutory Construction (2000 rev), Contemporaneous Construction, § 49.09, pp 103-112. The Legislature “is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it [reenacts] a statute without change ....” Lorillard, a Div of Loew’s Theatres, Inc v Pons, 434 US 575, 580; 98 S Ct 866; 55 L Ed 2d 40 (1978). “The reenactment rule differs from the legislative-acquiescence doctrine in that the former canon provides ‘prima facie evidence of legislative intent’ by the adoption, without modification, of a statutory provision that had already received judicial interpretation.” Hawkins, supra at 488, quoting Singer at 107. [Neal v Wilkes, 470 Mich 661, 676; 685 NW2d 648 (2004) (CAVANAGH, J., dissenting).]
I continue to find extremely persuasive the notion that a Legislature is presumed to be aware of this *614 Court’s decisions. Id.; see also Lindahl v Office of Personnel Mgt, 470 US 768, 782; 105 S Ct 1620; 84 L Ed 2d 674, (1985). Further, if the ramifications of Lewis were so dramatically detrimental to the no-fault system, there is all the more reason that the Legislature would have acted with great haste to amend the statute and explicitly ban equitable tolling. But it did not. Rather, despite numerous opportunities, the Legislature has left § 3145 intact. Its failure to change the statute to reflect an intent contrary to that which we found in Lewis is further support that this Court correctly concluded that equitable tolling was appropriate.
IV THE MAJORITY’S REASONING FOR FAILURE TO ADHERE TO STARE DECISIS IS FAULTY
The majority’s opinion seems to rest primarily on its analytically deficient conclusion that this Court should not employ equity in this case. Most egregiously, the majority accuses the Lewis Court of “act[ing] outside its constitutional authority,” ante at 583, while at the same time acknowledging this Court’s constitutional authority to do equity, ante at 590. The majority cites our Constitution’s directive that the judiciary must “exercise its ‘judicial power,’ ” see ante at 583 n 40, quoting Const 1963, art 3, § 2; art 6, § 1, but neglects to justify its conclusion that equity should not lie in the present case.
Indeed, despite its purported recognition that this Court’s equitable powers are, in fact, viable, the majority insists on trivializing my application of these powers. The majority grossly mischaracterizes my analysis as playing “an omnipresent and unassailable judicial trump card,” the result of my believing the statute is “unfair,” a “policy decisionG,” “omnisciente],” a “veil,” *615 a “policy choice,” “second-guess[ing],” a “whim[],” one of “various conceptions,” an “unrestricted license,” “wholesale pohcymaking,” without “basis,” and a “guise.” See ante at 588-591. These accusations are transparent attempts to suggest that a legitimate application of equity is a mere effort to install my own policy views. Not only could that not be further from the truth, but such belittling is a grave disservice to the citizens of this state.
As I have discussed, and as is thoughtfully articulated by Justice WEAVER, the Lewis decision was neither “ ‘unworkable’ ” nor “ ‘badly reasoned.’ ” See ante at 584. Rather, it was based on a centuries-old recognition of equitable tolling as an appropriate measure for avoiding injustices. It had “ ‘practical workability’ ” by requiring that both parties act promptly and by not giving either party an undue advantage over the other.[14] The decision was crafted in an effort to make undesired preemptive litigation unnecessary. There are no changes in the law or facts that justify overturning the decision. There are, contrary to the majority’s assertion otherwise, reliance interests at play that will, when Lewis is overruled, work undue hardships on insureds and on medical providers.
Insureds routinely choose their course of action— waiting or suing — on the basis of the actions of their insurers. Relying on equitable tolling, an insured knows that he need not rush to court the second the one-year period set forth in § 3145(1) has elapsed. The undue *616 hardship that will result from overturning Lewis is that instead of being able to engage in negotiations with an insurer, an insured must jump the gun, expend unnecessary time and resources, sue her insurer, and put herself in the awkward position of withstanding a summary disposition motion. Medical providers as well will suffer undue hardship because they will, in many instances, bear the losses that will result when an insurer does not timely deny .a claim and when the insured does not run to court to file a now-necessary preemptive lawsuit. It is quite logical to assume that medical providers have been relying on the equitable tolling rule of Lewis by continuing to provide treatment during the period in which a claim has not yet been denied.
The majority bizarrely claims that “the impact of Lewis is increasingly producing a tax on the no-fault system as claimants are being permitted to seek recovery for losses incurred much more than one year prior to commencing suit.” Ante at 586. But this fails to recognize that the benefits were already legitimately owed — thus, they can hardly be characterized as a “tax.” And in a situation where an insurer deliberately engages in dilatory tactics to avoid paying benefits, the nomenclature is even more unfitting.
The Lewis decision was sound, had practical workability, and gave clear guidance that is being relied upon on a daily basis. Further, the decision was grounded in an equitable rule, not “judicial defiance” as the majority so histrionically proclaims, so the Court did not incorrectly interpret the statute. See ante at 585. There is simply no basis for expunging Lewis and ignoring the directives of the doctrine of stare decisis. The best that can be said of today’s majority opinion is that it does indeed create a crystal-clear directive to Michigan’s *617 insureds: if your claim has not been paid or formally denied within one year of your request, sue.
V THE MAJORITY’S DECISION SHOULD NOT BE APPLIED RETROACTIVELY
For the reasons aptly set forth by Justice WEAVER, I fully agree that the majority’s misguided decision should not be visited on any insured by way of retroactive application.
VI. THE MAJORITY’S TONE DISSERVES THE JUDICIARY
Some readers, like myself, might find it difficult to wade through the thick swamp of hyperbole and rhetoric that permeates the majority’s opinion. With its opprobrious language,[15] the majority haughtily assumes *618 that no view other than its own is worthy of the printed page. Given that equitable tolling has a long history in state and federal jurisprudence, and given the persuasive reasons why an equitable remedy is mandated to prevent manifest injustice to insureds seeking benefits under § 3145,1 fail to grasp the basis for the criticisms.
Moreover, the majority’s overwrought scorn is rife with sarcasm,[16] sloganeering,[17] and outright fabrication.[18] The majority’s unbending devotion to strict textualism should not come at the expense of recognizing that the judiciary is not a mere robotic cog in the wheel of our three-branch system of government.[19] Rather, the judiciary has the ability — indeed, the responsibility — to do equity where equity is required. *619 Were that authority not historically within the judiciary’s purview, such a creature as equity would not even exist.
Further, the current majority has an obvious inability to recognize that to whatever extent a view different from the view it holds could be considered “judicial activism,” see, e.g., n 15 of this opinion, its own view can as well. In other words, accusing the Lewis Court of judicial activism simply because the Court reached a conclusion that this majority takes issue with does nothing to further the legitimate debate that surrounds divergent approaches. The majority opinion reeks of an unfortunately familiar tone that is, quite frankly, getting old.[20]
VII. CONCLUSION
Equitable tolling has a venerable history in federal and state jurisprudence that today’s majority ill-advisedly chooses to disregard in favor of denigrating the purposes of the no-fault act. I, unlike the majority, am not content with the dismissive notion that “the Legislature has made it so.” See ante at 583. The citizens of Michigan, and the Legislature, deserve better.
As is consistently recognized by the majority, our role is to effectuate the intent of the Legislature. Because I believe that equitable tolling has an important role in effecting the Legislature’s intent, that Lewis was correctly decided, and that overturning Lewis will work an *620 unjustifiable hardship on injured insureds and the no-fault system as a whole, I respectfully dissent.
KELLY, J., concurred with CAVANAGH, J.

 “Equitable tolling” is also referred to as “judicial tolling,” “the doctrine of contra non valentem,” and, in shareholder suits, “the doctrine of adverse domination.” Equitable tolling is usually discussed in the context of statutes of limitations. MCL 500.3145(1), in that it precludes recovering no-fault benefits incurred during a certain time period, is, for tolling purposes, no different than a statute of limitations.

 Indeed, the majority explicitly recognizes that equitable tolling is necessary in exactly the type of circumstance described in Irwin and 51 Am Jur 2d, p 563. See ante at 590 n 64, citing Cincinnati Ins Co v Citizens Ins Co, 454 Mich 263, 270; 562 NW2d 648 (1997). Its failure, discussed later in this opinion, is in refusing to acknowledge that this case presents exactly this type of circumstance.

 After this Court applied judicial tolling to MCL 500.3145(1) in Lewis, this Court considered whether judicial tolling was also applicable to MCL 500.3145(2). Secura Ins Co v Auto-Owners Ins Co, 461 Mich 382; 605 NW2d 308 (2000). In refusing to apply tolling to subsection 2, the Secura majority misunderstood the Lewis majority’s reasoning. The Secura majority stated, “The Lewis majority recognized tolling under subsection 1. However, that subsection includes language indicating that the Legislature intended that the one-year limitation period would be suspended by the giving of notice!.]” Id. at 386. As I noted in my dissent, “A careful reading of Lewis, however, reveals that the basis of our decision there was preserving legislative purposes, and not the sentence the majority highlights.... Thus, the majority relies on a phantom distinction to differentiate the instant case from Lewis, because applying the same analysis used in Lewis supports tolling the statute.” Secura, supra at 389 n 1 (Cavanagh, J., dissenting).

 Defendant ultimately resumed paying the benefits on October 15, 2003.

 Defendant claims that plaintiff did not notify it of her claim. Plaintiff presented evidence of a claims adjuster’s notes that suggest that plaintiff did notify defendant. Moreover, defendant was already paying attendant care benefits and stopped after it received information that it claims relieved it of its obligation to pay further benefits. Thus, it is difficult for me to conclude that defendant had no notice of plaintiffs claim for benefits. In any event, whether plaintiff properly notified defendant would be a factual matter to be resolved on remand.

 The majority claims that defendant’s cessation of payments gave plaintiff the “surest notice” that it would not be honoring her claim for benefits. Ante at 584. This simplistic approach fails to account for the inherent complexities of no-fault claim resolution. In many cases involving extensive injuries, there are hundreds if not thousands of claims for different types of benefits presented for payment, and there are extensive negotiations, resubmissions, evaluations, investigations, and the like. *603 Thus, to conclude that an insurer’s denial of one such claim among many is the “surest notice” that the claim will not be paid misrepresents reality. In essence, the majority’s statement merely emphasizes that a preemptive lawsuit is expressly necessary under its new rule.

 This assumes that the insured can successfully engage an attorney’s services. If the amount of the potential claim does not significantly exceed the cost of litigation, then, presumably, getting an attorney will be a difficult endeavor.

 In light of the majority’s renegade renunciation of equitable tolling, it is unnecessary to address the correctness of the Court of Appeals decision in Johnson v State Farm Mut Automobile Ins Co, 183 Mich App 752; 455 NW2d 420 (1990). Thus, I make no conclusions regarding whether the Court of Appeals correctly interpreted Lewis’s requirement that an insured make a “specific claim for benefits.”

 The majority attempts to explain away this discrepancy by arguing that because there is no statute to assist one in characterizing a cause of action, equity was appropriate in Bryant. Ante at 591 n 65. Strangely, the Bryant plaintiffs situation — “confusion”—fits less within the majority’s declaration of when equity should be applied (“fraud or mutual mistake,” ante at 590), than does the statute at hand, which allows an insurer to single-handedly divest a plaintiff of deserved benefits even when a plaintiff has diligently performed all her obligations. Thus, this is far from the lofty “fundamental disagreement” between the majority and *609 myself regarding when equity should be applied that the majority proclaims. Ante at 590 n 65. Rather, the majority’s inconsistency is a clear manifestation of its willingness to apply equity according to its own whims instead of according to the principles that govern it.
Further, it is misleading to suggest that the Lewis Court issued a protective blanket of equity to every plaintiff encountering a problem under MCL 500.3145(1). See ante at 590 n 65. The Lewis Court’s conditions that a plaintiff must submit a specific claim for benefits and be diligent necessitate a case-by-case examination of whether a particular plaintiff can avail herself of the equitable rule. In other words, not every plaintiff will be permitted to benefit from equitable tolling. Rather, the Lewis Court made the remedy potentially available to plaintiffs, but only when they met certain conditions.

 The majority’s statement that there are no “ ‘unusual circumstance [s]’ ” in this case is conveniently conclusory and, again, a variation on its dodge-and-duck theme. See ante at 591. I invite the public to reconcile the following premises of the majority. The majority claims that its charge is to further legislative intent. But it also claims that the only method of divining that intent is through the statute’s plain language. (It also assumes that this is possible with one-hundred percent “accuracy,” though split decisions from this very majority belie that assumption.) And it further claims that it can, indeed, employ equity. But it fails to explain how it could ever invoke its equitable powers if it limits itself to the statute’s plain language. It then turns a blind eye to the fact that its analysis does not further the well-known and consistently agreed-on legislative intent behind the no-fault act.

 This is evidenced by the sheer number of courts that have held likewise, cited earlier in this opinion.

 See also Bridges v Allstate Ins Co, 158 Mich App 276, 280-281; 404 NW2d 240 (1987), in which the Court noted that, although the “plaintiff filed a complaint, he wished to avoid the necessity of trying the action and felt that there was a very real possibility that his claim would be paid.”

 I use that term as a figure of speech, not as a literal comment on the no-fault system.

 To the extent the Court of Appeals may have misapplied the requirement that an insured must submit a specific claim for benefits in Johnson, supra, such error is easily corrected. If the Court of Appeals erred, we need not, as the majority insists, clamor to overrule the underlying case. See ante at 586. Rather, the usual, and much more logical, path is to overturn the aberrant Court of Appeals case if it did not adhere to our prior precedent.

 Discrediting a long line of the past opinions written by a bench curiously not including any member of the current majority, the majority gets quite carried away in an apparent effort to convince the reader that its view is superior to any other ever proffered. Keeping in mind the above discussion of the widespread acceptance of equitable tolling and the reasons why applying tolling to § 3145(1) is necessary to fulfill the purposes of the no-fault act and to prevent an insurer from wrongfully withholding benefits from an injured plaintiff, consider these frenzied phraseologies: “under this thin veil, [the majorities] inserted their own policy views,” ante at 573; “impermissible departure,” id. at 578; “supplanted the will of the Legislature with its own assessment of policy and consumer expectations,” id.; “curious incongruity,” id. at 579; “quite broad,” id. at 580; “vague,” id. at 581; “dismantled the certainty,” id.; “questionable lineage,” id.; “judicial negation,” id.; “abrupt departure from settled precedent,” id.; “shrugged off the weight of binding precedent,” id. at 582; “crafting its own amendment,” id.; “distortion,” id.; “unmanageability,” id.; “purely for policy reasons,” id.; “direct contravention of the statutory language,” id.; “prevailing policy whims,” id. “own perception,” id.; “impermissibly legislated from the bench,” id.; “speculation,” id.; “acted outside its constitutional authority,” id. at 583; “importing its own policy views,” id.; “we are unable to perceive any sound policy basis,” id.; “judicial defiance,” id. at 585 (emphasis in original); “judicial usurpation,” id.; and “defies ‘practical workability,’ ” id. at 585; “wrongly decided,” id. at 586.

 See n 15 of this opinion.

 See id.

 See id.

 Indeed, as in this case, strict textualism can have consequences that we would be wise to avoid. See Zelinsky, Travelers, reasoned textualism, & the new jurisprudence of ERISA preemption, 21 Cardozo L R 807, 808 n 3 (1999):
See, e.g., Ellen E Aprill, The Law of the Word: Dictionary Shopping in the Supreme Court, 30 Ariz. St. L. J. 275, 324 (1998) (criticizing Shaw v. Delta Air Lines, Inc., 463 U.S. 85 (1983), as an “easy, dictionary-driven, plain meaning disposition of the term... [which] produced a flood of litigation for the lower federal courts”; Catherine L. Fisk, The Last Article About the Language of ERISA Preemption? A Case Study of the Failure of Textualism, 33 Harv. J. on Legis. 35, 39 (1996) (“If ever there were a case study of the failures of textualism as a method of statutory interpretation, this is it.”); Peter D. Jacobson & Scott D. Pomfret, Form, Function, and Managed Care Torts: Achieving Fairness and Equity in ERISA Jurisprudence, 35 Hous. L. Rev. 985, 990 (1998) (criticizing the Supreme Court for “a mechanical approach [to ERISA preemption] that adheres to a strict ‘plain language’ interpretation without questioning whether the result of these interpretations can he reconciled with congressional intent”).

 The authors of such phrases as those quoted in n 15 of this opinion would do well to keep in mind that despite how ardently they convince themselves of the supremacy of their position, their reasoning is not infallible. See Halbert v Michigan,_US_; 125 S Ct 2582; 162 L Ed 2d 552 (2005); Yellow Transportation, Inc v Michigan, 537 US 36; 123 S Ct 371; 154 L Ed 2d 377 (2002).